UNITED STATES of America, Appellee,

v.

John H. OGDEN, Jr., Defendant,
Appellant.

No. 81–1442.

United States Court of Appeals,
First Circuit.

Argued Dec. 10, 1982.

Decided March 22, 1983.

Anthony M. Traini, Boston, Mass., with whom Leppo & Traini, Boston, Mass., was on brief, for defendant, appellant.

F. Mark Terison, Asst. U.S. Atty., Auburn, Me., with whom Richard S. Cohen, U.S. Atty., Portland, Me., was on brief, for appellee.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, and SMITH,* Senior District Judge.

BOWNES, Circuit Judge.

Defendant-appellant John H. Ogden, Jr. was convicted by a jury of the transportation of stolen components of a 1975 Kenworth motor freight tractor in violation of 18 U.S.C. § 2314 and receipt of the same stolen tractor components in violation of 18 U.S.C. § 2315.

Three issues are raised on appeal:

1. whether defendant's pretrial motion to suppress evidence was properly denied;

2. whether the indictment should have been dismissed for prosecutorial abuse; and

3. whether defendant was properly charged under 18 U.S.C. §§ 2314 and 2315.

* Of the District of Montana, sitting by designation.

## I. THE SUPPRESSION ISSUE

*The Facts*

The facts adduced at the lengthy suppression hearing are not hotly disputed, only the legal conclusions to be drawn from them. A little information about Stonington, Maine, is necessary. Stonington is located on the southern tip of Deer Isle, a sparsely populated island jutting out into the Atlantic Ocean. The main road in the island is Route 15; it leads to and terminates at Stonington. The chief industry of the town is fishing. There is an abandoned granite quarry with a deep water dock in a section of the town called the "settlement area." A boat repair establishment and fish-loading business are located in this area. The settlement area is also popular with young people because it lends itself to a trysting place for romance. There is a chain across the road leading to the settlement area which is a barrier to traffic; the chain is lowered during normal working hours.

The case began at about 8:15 p.m. on March 14, 1980, when the police chief of Stonington, Richard Sweetsir, received a phone call from a local resident informing him that four large tractor-trailer trucks had been seen going south towards Stonington on Route 15. The caller's remarks that these were "strange trucks" and "it didn't look right" struck a responsive chord in Sweetsir for several reasons. Trucks that were used regularly for transporting fish were locally owned and familiar to Stonington residents. All fishing activity had been halted by a week of very stormy weather. Sweetsir had been told earlier that week by the Maine State Police to be on the alert for strange trucks that might be used in smuggling operations on the island.

After receiving the call, Sweetsir decided to investigate. He first called Trooper Bruce Setler of the State Police, told him about the trucks and arranged to meet him at a local gas station. Sweetsir then drove to the settlement area. As he drove through Stonington village, he saw that the local fishing boats were tied up at the docks. When the chief got to the approach to the settlement area he found the chain

down. He thought this odd because normally the area is not used at night (except for romance) and the chief knew that no fish-loading operations were scheduled for that night.

Sweetsir then met State Trooper Setler as arranged. Before meeting Sweetsir, Setler had called another state trooper, Brian White, and told him about the report of strange tractor-trailers in the area. White joined Sweetsir and Setler at the filling station after notifying Sergeant Harry Bailey and Special Agent Michael Vittum of the report of strange trucks in the area. Bailey and Vittum were members of the Division of Special Investigations of the State Police. The meeting at the filling station took place at about 9:15 p.m., after which the three men went to Sweetsir's house. They returned to the filling station at about 11:10 p.m. Ten minutes later, at approximately 11:20 p.m., White and Setler left together in one cruiser to go to the settlement area. As they approached the area, they saw a forty-foot tractor-trailer leaving it. The truck proceeded to Route 15 and headed north. The officers followed it. Another tractor-trailer came out of the settlement area and proceeded along behind the troopers' cruiser. When the two trucks with the cruiser between them went past the filling station, Sweetsir pulled out and followed in his car. Two other tractor-trailers, which apparently had also just left the settlement area, followed behind Sweetsir.

At about 11:30 p.m. White and Setler stopped the lead truck and Sweetsir halted the other three. The stop was made approximately two miles beyond the gas station. The defendant was driving the lead truck which consisted of a 1975 Kenworth tractor with Massachusetts plates C 82–497 and a 1970 Trailmobile trailer. When Setler and White approached the truck to check the driver's license and vehicle registration, Setler recognized the defendant as being implicated in a pending state court case involving stolen property. Defendant produced a Massachusetts license and registration showing that Emanon Trucking Co., Inc., owned the truck. Defendant did not

have a Public Utilities Commission permit or a manifest. He explained this by stating that the trailer was empty and that he had come to Maine only because of a court case in Ellsworth. White checked the trailer and found it empty except for two dollies. Defendant then gave a different reason for his presence on Deer Isle. He said that he had originally come to Maine to haul a load of potatoes from Aroostook County, but changed his plans after meeting a man named "Murray" or "Murphy" at a truck stop near Bangor. According to defendant, this man offered him four hundred dollars to haul a load of fish from Stonington to Boston. Defendant said that he followed the man to Stonington, but the boat carrying the fish never arrived.

A check of the identification of the people in the other three trucks and the truck registrations was then made. Two of the trucks were registered to defendant's mother, Josephine Ogden, doing business as Ever Ready Trucking. One was a black 1967 Mack tractor with a 1970 Mack trailer, the other was a 1970 black Kenworth with a 1970 Great Dane trailer. The fourth truck was a 1974 Peterbilt tractor with a 1974 utility trailer. It was registered to the driver, Joseph Sullivan, and is not involved in this case.

Sometime after White and Setler returned to their cruiser to check the licenses and registrations and record the information obtained, defendant joined them. Without prodding or questioning, he repeated his story about hauling the load of fish that never arrived at Stonington.

Within thirty minutes of the time the truck caravan was first stopped, a local resident, Bradley Jones, arrived at the scene in a pick-up truck. After being told by Sweetsir that Jones had some information about the trucks, White went over to Jones' pick-up. Jones told White that he had been in the settlement area earlier that evening looking for a girl. A red Blazer pick-up truck and four tractor-trailers were in the area. Jones was captured by a man wearing a ski mask who took him to the Blazer. Thereupon, a man in the Blazer told Jones'

captor to put him in a nearby van. There were others being held in the van. When Jones was in the van, he heard the men in the front seat trying to make radio contact with a boat. The question, "Where's the boat?" was repeatedly asked. One or more of them said they were going to "blow the deal." Jones and the others were given three hundred dollars each and told to forget everything they had seen or heard and then released. Jones promptly contacted the police.

Because of the freezing rain and icy and narrow road the police thought it prudent to drive to a local high school parking lot. The truck drivers agreed. The licenses and registrations were not returned because the troopers had not yet finished their paper work. The caravan left for the parking lot at 12:28 a.m. The roadside investigation had lasted about one hour.

On the way to the high school parking lot, Sergeant Bailey of the state police special investigation unit was informed of what had occurred. Bailey instructed White to hold the trucks and all occupants until Drug Enforcement Administration (DEA) agents arrived at the parking lot. At the parking lot White read defendant his Miranda rights and then interviewed him. Defendant adhered to his "fish" story. The occupants of the other trucks also said that they came to the settlement area to pick up a load of fish and when the boat did not come, they left.

DEA Agents Drinan and Cuniff arrived at the parking lot at about 5:30 a.m. Cuniff seized the trucks pursuant to 21 U.S.C. § 881 which provides for forfeiture of conveyances used to transport drugs. All of the truck occupants were arrested for conspiracy to smuggle marijuana.

The next day, March 16, the trucks were taken to Camp Keyes, a National Guard camp in Augusta, pending further investigation. As the trucks were driven into the camp, they were observed by Sergeant Peter McCarthy of the State Police who was stationed at the gate. McCarthy had been warned by the Massachusetts State Police that it was suspected that these trucks con-

tained stolen parts. McCarthy noticed that the 1967 Mack tractor appeared to have a double drive shaft. He went over to it, bent down slightly, looked underneath and confirmed his suspicion that the tractor did have a double drive shaft. McCarthy did not crawl under the tractor, nor did he open the hood. The vehicle identification number of the tractor, which had been given McCarthy by the Massachusetts State Police, showed that the tractor should have had a single drive shaft. McCarthy subsequently informed FBI Agent Gerald Mahoney of what he had observed. Later the same day all four trucks were searched pursuant to warrants for drug smuggling evidence. Nothing of any consequence was found and the charges of conspiracy to smuggle marijuana were subsequently dismissed.

On March 18, two days after the trucks had been impounded at Camp Keyes, FBI Agent Mahoney personally viewed the 1967 Mack tractor and noted the double drive shaft. Following essentially the same procedure as McCarthy, he got within three or four feet of the tractor and stopped to look underneath. He did not crawl under the tractor or lift up the engine hood.

Mahoney executed an affidavit for search warrants. He averred that he had observed that the 1967 Mack tractor had a vehicle identification number LINR607T1022 and was "a six wheel tandem with a double drive shaft." Mahoney further stated that based on his discussion with a representative of Mack trucks this vehicle identification number applied to a tractor with a single drive shaft. The affidavit further recited that Mahoney was familiar with the practice of using false vehicle identification numbers for concealing the fact that a vehicle had been stolen or contained stolen parts. Mahoney also stated that he knew that defendant had been involved in prior instances of receiving stolen property and possession of a motor vehicle with a vehicle identification number that had been changed. The Mahoney affidavit also incorporated the earlier affidavit given by DEA Agent Drinan for the drug smuggling warrants which recited the facts leading to

the seizure of the trucks and stated that defendant was implicated in a pending Massachusetts case involving stolen property. Search warrants were issued authorizing a search of the three trucks for "identifying marks, numbers and data, all of which constitute evidence of the crime of interstate transportation of stolen vehicles and evidence of true ownership of the tractor and trailer specified." The three trucks were searched pursuant to the warrants on March 20.

*Legal Conclusions*

■ Defendant's first claim is that the stop of the trucks on the highway violated his fourth amendment rights. The question is whether the officers had "a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). *See also Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975). We agree with the district court that the officers had reasonable objective grounds to suspect that the four trucks came to Stonington pursuant to a drug smuggling scheme. The salient facts pointed clearly in that direction: the officers knew that drug smuggling was being carried on along this area of the Maine Coast; four large tractor-trailers from out-of-state had gone at night to a location with a deep-water docking facility; the settlement area was not used for commercial purposes at night; there was no legitimate reason for the trucks being there; severe winter weather had prevented fishing for about a week making it unlikely there would be any fish to haul. Under these facts, the officers would have been derelict in their duty if they had not stopped the trucks for investigation. Defendant's constitutional rights were not violated by the stop of the trucks.

■ Defendant next contends that, even if the initial stop of the trucks was permissible, their continued detention on the road

exceeded the scope of an investigatory stop and violated his fourth amendment rights. In the seminal case in this field, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court noted:

> The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all. The Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation. Compare *Katz v. United States*, 389 U.S. 347, 354–356, 88 S.Ct. 507, 512–514, 19 L.Ed.2d 576 (1967).

*Id.* at 28–29, 88 S.Ct. at 1883–1884. The test is whether the stop and inquiry were "reasonably related in scope to the justification for their initiation." *Id. See United States v. Brignoni-Ponce*, 422 U.S. at 881, 95 S.Ct. at 2580.

We start our analysis by noting that there were four tractor-trailers and ten people to be checked. In addition to the four drivers the second, third, and fourth trucks in the caravan had two passengers each. The officers obtained the driver's license and registration from each truck and some sort of identification from each passenger. They were collating this information when Bradley Jones arrived on the scene.[1]

If Jones had not interrupted the identification and document check, we do not know how long it would have taken; it was not completed until after the trucks moved to the high school parking lot. Considering the number of vehicles and people involved, we do not think that a thirty to forty-minute investigatory stop would have been unreasonable. It might even be argued that one hour would have been reasonable. We do not think, however, that the length of the detention is crucial because, as the district court pointed out, there was probable cause for arrest after Bradley Jones related his experience, which was about one-half hour after the vehicles were stopped. "The

usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony, . . . ." *Carroll v. United States*, 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925). We think there was reasonable cause to believe that defendant and the other drivers and passengers were engaged in a smuggling venture. Before Jones arrived, the suspicions of the police had been heightened by four things: Officer Setler recognized the defendant as being implicated in a state court case involving stolen property; the defendant had no manifest or public utilities commission permit; the defendant gave two different and contradictory explanations of why he was in Stonington with a tractor-trailer; and one of the passengers in the Sullivan truck gave the officers a name different from the one on his driver's license. The Jones statement elevated reasonable suspicion into probable cause for arrest. *See United States v. Vargas*, 633 F.2d 891, 898 (1st Cir.1980).

Appellant relies heavily on *United States v. Miller*, 589 F.2d 1117 (1st Cir.1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979), in arguing that the detention violated his fourth amendment rights. In *Miller*, however, the government's position was that probable cause for arrest was not needed to justify the detention. We rejected that position, noting that defendant's detention was "closer along the spectrum to arrest than to an investigatory stop." *Id.* at 1127. Here, there was not only probable cause for an arrest, but an arrest was effectively made, as the government concedes, when the officers retained the licenses and registrations and moved the caravan to the high school parking lot. The formal arrest by DEA Agent Cuniff in the parking lot at 5:30 a.m. was merely frosting on the cake.

■ For the same reasons, the seizure of the trucks by Cuniff at the high school did not violate defendant's fourth amendment rights. Prior to the seizure the police had

---

1. Appellant's brief at pages 11 and 12 refers to local teenagers being interviewed at the scene and at the high school. We have not been able to find anything pertaining to interviews with teenagers in the record. Bradley Jones was described as being in his early twenties.

probable cause to believe that the trucks were to be used in a drug smuggling conspiracy. 21 U.S.C. § 881(a)(4) provides for the forfeiture of "[a]ll conveyances, including aircraft, vehicles, or vessels, which are used, or are *intended for use,* to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or conceal-· ment of [controlled substances]." (Emphasis added.) Even though no contraband was found in the trailers, a vehicle may be seized if there is probable cause to believe that it was used or was intended for use to facilitate the transportation of contraband. *United States v. Johnson,* 572 F.2d 227, 234 (9th Cir.), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1137 (1978).

■ Although the issue has not been explicitly raised in defendant's brief, we point out the obvious. There are no grounds for suppressing any of defendant's statements to the police. The first two statements were made voluntarily before an arrest had been effected. The interview by Officer White at the high school parking lot was preceded by the *Miranda* warning.

■ Defendant next asserts that the search warrants were not valid because of the insufficiency of the Mahoney affidavit.[2] The requirements of search warrant affidavits are clear: "It is established law . . . that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware,* 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978). And affidavits "must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion." *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965).

We think that the Mahoney affidavit passed muster. It stated that he was familiar with methods used to conceal stolen parts and vehicles:

the assembly of vehicles from stolen component parts, the application of legitimate VIN plates on stolen units, the use of VIN plates obtained from wrecked vehicles or from factory glider kit purchases, and the incorrect registration of stolen vehicles in cases where titles are not required;

that Mahoney was given the VINs of the four tractor-trailer units seized; and that Mahoney had learned from a comparison of information obtained through his investigation of other sources (Massachusetts Registry of Motor Vehicles, National Automobile Theft Bureau, a local insurance agent, etc.) that one of the VINs was inappropriate for the type of tractor on which it was found and that two of the VINs appeared to have come from other units. Specifically, the affidavit recited that the 1967 Mack tractor bore the VIN of a single drive shaft tractor, when in fact the tractor had a double drive shaft; that the 1975 Kenworth tractor had the VIN of a "factory glider kit"; that the 1970 Kenworth tractor had the VIN of a wrecked unit. The affidavit also incorporated the drug smuggling affidavit of DEA Agent Drinan which recited the facts of the stop, arrest and seizure, and defendant's implication in a pending Massachusetts case involving stolen property.

Read as a whole and with common sense, we think the affidavit provided more than sufficient grounds for search warrants addressed to the probability that trucks or truck parts had been stolen.

Finally, defendant attacks the warrants on the grounds that they were too broad and allowed "exploratory rummaging" in contravention of the fourth amendment. We can do no better than to quote the district court on this point:

Each warrant limited the search to the particular vehicle named and to a particular category of evidence—numbers, data or marks identifying the vehicle or its component parts. The category of evi-

---

**2.** Appellant's brief does not raise the issue of whether the examinations of the 1967 Mack tractor made by Officer McCarthy and FBI Agent Mahoney at Camp Keyes amounted to warrantless searches. We agree with the district court that these were only examinations of the exterior of the vehicle and did not implicate the fourth amendment.

dence specified did not go beyond the foundation of probable cause established in the supporting affidavit. *See United States v. Roche,* 614 F.2d 6, 7 (1st Cir. 1980); *In re Application of Lafayette Academy, Inc.,* 610 F.2d 1 (1st Cir.1979). Without merit is defendant's contention that, because the warrant could have been more specific by naming the particular parts alleged to be stolen and by specifying the precise location of each identification number, the description used was fatally overbroad. When the object of a search is stolen property, necessarily the warrant must in many instances speak in generic terms. *United States v. Abrams,* 615 F.2d 541, 545 (1st Cir.1980). For all practical purposes, the material sought could not be more precisely described. *See United States v. Cortellesso,* 601 F.2d 28, 33 (1st Cir.1979) [*cert. denied,* 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980) ]. In sum, the warrants narrowed the category of evidence sufficiently to confine the officers' exercise of discretion in conducting the search even though they did not pinpoint precisely the location of each identification number.

Defendant's Appendix at 62.

The facts and the law compel an affirmance of the district court's denial of the motion to suppress.

## II. PROSECUTORIAL ABUSE OF THE GRAND JURY PROCEEDINGS

Defendant contends that the indictment was a result of prosecutorial misconduct and should have been dismissed. It is alleged that the prosecutor gave unsworn testimony to the grand jury and rendered his personal opinion and belief in the defendant's guilt.

■ We recognize that abuse and perversion of the fact finding process of the grand jury by the prosecutor may necessitate a dismissal of an indictment. *See United States v. Udziela,* 671 F.2d 995, 998–99 (7th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 2964, 73 L.Ed.2d 1353 (1982); *United States v. Singer,* 660 F.2d 1295, 1302–03 (8th Cir.

1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982); *United States v. Samango,* 607 F.2d 877 (9th Cir.1979); *United States v. Chanen,* 549 F.2d 1306 (9th Cir.1977), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977).

■ The basic rule is that, because of the constitutionally mandated independence of the grand jury and the prosecutor, courts should be reluctant to dismiss an indictment. A dismissal will, therefore, be ordered only for serious and blatant prosecutorial misconduct that distorts the integrity of the judicial process. *United States v. Udziella, supra,* at 999; *United States v. Samango, supra,* at 881. We need not decide, however, whether there was such misconduct in this case because a review of the grand jury proceedings reveals that there was neither testimony by the prosecutor nor a personal expression by him that defendant was guilty.

■ After extensive and, at times, confusing testimony by FBI Agent Carroll Farmer of how he checked and cross-checked serial numbers of truck parts and engines and vehicle registration numbers the prosecutor asked the grand jury if there were any questions. The witness answered a question and the following colloquy took place between a grand juror and prosecutor Brannigan.

Q I don't know if that's an answer to my question or not. My question really, what I'm saying is, were these trucks perhaps put together by someone else and sold to Mr. Ogden afterwards?

MR. BRANNINGAN: Perhaps I can answer the question from his prior testimony.

At least insofar as the 1970 Kenworth we were talking about, Mr. Ogden himself went down and purchased a wreck—

A GRAND JUROR: Right

MR. BRANNINGAN: —which was damaged beyond all repair, okay, except for the engine. And I believe that that engine in fact is in the 1970—purportedly the 1970 Kenworth that is registered with the serial number of the wreck. But in

fact, the serial number of the unit itself, that is, the cab, the number that he found, Mr. Farmer found in the cab did not correspond with the serial number of the wreck. And so that Mr. Ogden would be the one who assembled that vehicle, since he purchased the wreck and the engine from the wreck ended up in this particular truck.

Do you understand what I mean?

A GRAND JUROR: Is that illegal, to purchase an engine and put it in another vehicle?

MR. BRANNINGAN: Well, it's not illegal to do that, but what he did was, then he registered the vehicle into which he put the engine under the serial number of the wreck. He should have registered it, if it were legal, under its own serial number.

In response to another question about engine numbers, the prosecutor stated:

MR. BRANNINGAN: Okay. But what happened here is that [a] legitimate engine was put in a stolen truck, okay? Ogden bought the engine and Ogden registered the truck. However, when he registered the truck, he registered it under the vehicle identification number of the wreck, which it was not, okay?

So insofar as that, the fact—you can establish that Ogden was the one who put it together. I think that where you're dealing with a vehicle with a chipped off number and so on and so forth—

A GRAND JUROR: Right.

MR. BRANNINGAN: —that you're really talking about whether or not it goes to his criminal intent; I mean, did he really intend to do that?

It is apparent that the first statement by the prosecutor was, as he pointed out himself, a summary of the prior testimony of the FBI agent. This is not the situation of the grand jury being lulled by a steady flow of information into accepting testimony as true without realizing that it was the prosecutor who was supplying the testimony. *United States v. Samango,* 607 F.2d at 881.

Neither statement, nor any other part of the grand jury proceedings, affords the slightest basis for the claim that the prosecutor evinced a personal belief that defendant was guilty.

## III. WHETHER DEFENDANT WAS PROPERLY CHARGED IN THE INDICTMENT

█ The pertinent evidence given before the grand jury and the proof adduced at trial was to the following effect. In December of 1978, a 1977 Kenworth tractor owned by a Canadian Company was stolen in Boston. Defendant obtained the engine, turbocharger, transmission, front axle, frame and cab of the tractor knowing that these parts came from a stolen motor vehicle. Defendant also obtained the wreck of a 1975 Kenworth tractor with a useable sleeper (located behind the cab) and rear end (two axles and their components). The parts of the 1977 stolen Kenworth tractor and the 1975 Kenworth wreck were combined to make one tractor. This vehicle, which was the one defendant was driving when he was arrested, was registered in Massachusetts by using the motor vehicle identification number of the wreck.

Defendant was indicted for violation of 18 U.S.C. § 2314, the knowing transportation of stolen "goods, wares, merchandise" in interstate commerce (Count I) and for violation of 18 U.S.C. § 2315, concealment of such "goods, wares, merchandise," (Count II).[3] He claims that the indictment should have been brought under the Dyer Act, 18 U.S.C. §§ 2312 and 2313, which prohibits the knowing interstate transporta-

---

**3.** Counts I and II read as follows:

*Count I*

On or about March 14, 1980, in the District of Maine, the defendant

JOHN H. OGDEN, JR.

unlawfully did transport in interstate commerce from Massachusetts to Maine goods, wares and merchandise, to wit, components of a motor freight tractor registered as a 1975 Kenworth tractor bearing Massachusetts license plate No. C 82–497, and components of a motor freight trailer registered as a 1970 Trailmobile trailer bearing Massachusetts license plate No. TY 3721, of the value of $5,000 and more, knowing the same components to have been stolen, converted and taken by fraud, in violation of Title 18, United States Code, Section 2314.

tion and concealment of a stolen motor vehicle.[4]

We turn first to the words of the statute. Motor vehicle is defined in 18 U.S.C. § 2311 as including "an automobile, automobile truck, automobile wagon, motorcycle, or any other self-propelled vehicle designed for running on land but not on rails." There is no definition of goods, wares or merchandise. The statutory definition of motor vehicle does not advance us very far. The tractor which was made by combining the stolen Canadian tractor parts with the parts from the wreck clearly comes within the statutory definition of motor vehicle. The question is whether the stolen parts should be treated separately or became by combination with the other parts a stolen motor vehicle.

We have been unable to find anything in the legislative history of the statutes that sheds light on this issue.

The question in most of the cases involving stolen motor vehicle parts has been the applicability of the Dyer Act, 18 U.S.C. §§ 2312 and 2313. Most courts have followed the example of the Supreme Court in *United States v. Turley*, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), and given the Dyer Act an expansive reading. In reaching its holding that the word "stolen" included all felonious takings regardless of whether the theft constituted common law larceny, the Court stated: "Professional thieves resort to innumerable forms of theft and Congress presumably sought to meet the need for federal action effectively rather than to leave loopholes for evasion." *Id.* at 416–17, 77 S.Ct. at 402.

In *United States v. Hess*, 691 F.2d 984, 989 (11th Cir.1982), the Fifth Circuit quoted *Turley* and held that a stolen motor vehicle dismantled into parts at defendant's request before being transported interstate was a Dyer Act violation. *United States v. Payne*, 635 F.2d 643, 645 (7th Cir.1980), *cert. denied*, 451 U.S. 972, 101 S.Ct. 2050, 68 L.Ed.2d 351 (1981), held that the interstate transportation of truck parts which had been severed from a stolen motor vehicle was a Dyer Act violation because to rule otherwise "would contravene the policy of the Dyer Act and the intent of Congress." *United States v. Harris*, 528 F.2d 1327, 1330 (8th Cir.1975), held that it was sufficient for a Dyer Act violation to show that some of the major parts in the vehicle had been stolen. The Eighth Circuit upheld a Dyer

---

*Count II*
   On or about March 14, 1980, in the District of Maine, the defendant
   JOHN H. OGDEN, JR.
unlawfully did receive and conceal goods, wares and merchandise, to wit, components of the motor freight tractor and trailer described in Count I, of the value of $5,000 and more, moving as, which were a part of and which constituted interstate and foreign commerce, knowing the same components to have been stolen, unlawfully converted, and taken, in violation of Title 18, United States Code, Section 2315.
The government produced no evidence as to the trailer and the jury was instructed that the case was limited to the tractor.

4.  The relevant parts of the statute provide:
   § 2312.  **Transportation of stolen vehicles**
      Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.
   § 2313.  **Sale or receipt of stolen vehicles**
      Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, moving as, or which is a part of, or

which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.
   § 2314.  **Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting**
      Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; . . .
      . . . .
      Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
   § 2315.  **Sale or receipt of stolen goods, securities, moneys, or fraudulent State tax stamps**
      Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, . . ., knowing the same to have been stolen, unlawfully converted, or taken; . . .
      . . . .
      Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Act conviction based on stolen trucks disguised with lawfully obtained frames and markings. *United States v. Neville*, 516 F.2d 1302, *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 251 (1975). One of the cases frequently cited on whether the Dyer Act applies to stolen motor vehicle parts is *United States v. Wallace*, 254 F.Supp. 653 (E.D.Tenn.1965). There, the defendant purchased an automobile which had been wrecked in Tennessee and combined its major parts with the major parts of an automobile which had been stolen in Georgia. The court instructed the jury that the Dyer Act applied if the motor vehicle included major parts that were stolen and "it is no defense that some of its parts were not stolen." *Id.* at 654.

There are a few cases holding the Dyer Act inapplicable to stolen motor vehicle parts. *United States v. Shanks*, 521 F.2d 83 (7th Cir.1975), held that the transportation of a stolen engine transmission and a double axle rear end carried in the bed of another truck was not a Dyer Act violation. The transportation interstate of a stolen engine block was held not to contravene the Dyer Act. *United States v. Bishop*, 434 F.2d 1284 (6th Cir.1970).[5]

We have found no cases, and counsel have cited none, discussing the applicability of 18 U.S.C. §§ 2314 and 2315 to stolen motor vehicle parts. The closest is a case holding that a stolen trailer, which was attached to the tractor when both were stolen, was goods rather than a motor vehicle. *United States v. Lofty*, 455 F.2d 506 (4th Cir.1972). A stolen trailer standing alone has been held to be goods, not a motor vehicle. *United States v. Kidding*, 560 F.2d 1303, 1308 (7th Cir.1977); *United States v. Kelly*, 435 F.2d 1288 (9th Cir.), *cert. denied*, 401 U.S. 921, 91 S.Ct. 909, 27 L.Ed.2d 802 (1971).

If this were an "either-or" choice, we would be constrained to hold that the Dyer Act was applicable. But we do not think the government must lose because the Dyer Act could apply. The words "goods, wares, merchandise" used in §§ 2314 and 2315, individually or collectively, encompass motor vehicle parts. Defendant has not claimed that he was misled or confused by the indictment or did not understand the offense with which he was charged. The Dyer Act and 18 U.S.C. §§ 2314 and 2315 are overlapping, not mutually exclusive. In a situation such as this where the defendant has obtained parts from a stolen motor vehicle and combined them with other parts to make a different vehicle, we think the prosecutor can properly focus on the stolen parts rather than the motor vehicle. We realize his choice may be influenced by the fact that the penalty for a violation of §§ 2314 and/or 2315 is twice that of the Dyer Act[6]. The penalties, however, do not change the substantive provisions of the statutes.

*Affirmed.*

---

**5.** The court upheld the conviction on the grounds that the presence of the engine block and frame in two separate parts on defendant's property raised the inference that the vehicle had been stolen by defendant and cut up afterwards. *United States v. Bishop*, 434 F.2d 1284, 1287 (6th Cir.1970).

**6.** The penalty under each of the Dyer Act statutes is a maximum term of imprisonment of five years and a maximum fine of $5,000; under §§ 2314 and 2315, the maximum prison term is ten years and the fine cannot exceed $10,000. In this case, the defendant was given two concurrent five-year sentences.