**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Pornpong VANICHROMANEE, Defendant-Appellant.**

**No. 83–2295.**

United States Court of Appeals, Seventh Circuit.

Argued March 26, 1984.

Decided Aug. 15, 1984.

George Becker, Chicago, Ill., for defendant-appellant.

John L. Sullivan, Asst. U.S. Atty., Dan K. Webb, U.S.Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, WOOD and ESCH-BACH, Circuit Judges.

ESCHBACH, Circuit Judge.

Pornpong Vanichromanee was named in five counts of a six count indictment.[1] Count I charged a conspiracy to import heroin in violation of 21 U.S.C. § 963. Counts II and V charged him with interstate travel with the intent to promote or carry on an unlawful activity in violation of 18 U.S.C. § 1952(a)(3), (b). Count III charged a conspiracy to possess with intent to distribute and to distribute heroin in violation of 21 U.S.C. § 846. Finally, Count VI charged distribution of heroin in violation of 21 U.S.C. § 841(a)(1). Following a bench trial, Vanichromanee was found guilty on all five counts. He was sentenced to concurrent ten year terms of imprisonment on Counts I, II, III, and V, to be followed by five years of probation on Count VI. Vanichromanee appeals and we affirm the convictions.

### I.

On April 26, 1982, Somsuan Chaisri ("Somsuan"), a Chicago resident, received a letter from Thailand. The author of the letter, Sarasak Naranong, was unknown to her, but he wrote that he was a friend of her finance. Naranong requested Somsuan to accept delivery of several packages, which he would retrieve from her when he arrived in the United States.

On the following day, a package addressed to Somsuan passed through customs at the Air Mail Facility in the John F. Kennedy Airport in New York. Because of its suspicious appearance, a customs inspector pulled the package. A subsequent search revealed that the package contained a picture and that the picture frame concealed heroin. Most of the heroin was re-

moved and replaced with a substitute. A beeper was also placed in the frame. After these actions were taken, the package was forwarded to Chicago for delivery. On April 28, four more packages addressed to Somsuan were processed. They, too, had heroin-filled picture frames, and customs agents removed the heroin and inserted a substitute and a beeper. A total of 22 pounds of heroin was discovered in the five packages.

Vanichromanee and Naovarat Vanichrat (a friend of Somsuan) obtained visas from the American Embassy in Thailand to enter the United States. They then traveled to the United States, by way of Tokyo, and arrived in New York City on April 30. They were on the same plane from Tokyo, as evidenced by the consecutive numbers on their customs immigration forms, and passed through the same customs check, as evidenced by their passports being stamped by the same customs inspector. They spent the night at the Hotel Edison in New York City. On May 1, Vanichromanee purchased two Amtrack tickets to Chicago and on the second of May, he rented a room at the Chicago Holiday Inn on Lake Shore Drive (hereinafter "Holiday Inn").

On May 3, Somsuan received a call from a man who identified himself as the author of the April 26 letter. He asked whether the packages had arrived yet; she informed him that they had not. Later that day, however, two of the parcels were delivered to Somsuan's apartment. A postal inspector attempted to delivery a third package on May 5, but Somsuan was not home at the time of the delivery. She called for the package at the post office later that day.

Vanichrat called Somsuan early on May 6 and had her pick him up at the Holiday Inn. He informed her that he had come to the United States with the author of the April 26 letter. After they returned to Somsuan's apartment, the final two packages arrived. The postal inspector saw an orien-

---

1. Codefendant Naovarat Vanichrat did not appeal. Vanichrat was named in Counts I, III, IV, and VI.

tal man take one of the packages and rip off the outer cover. About 4:40 that afternoon, one of the beepers in the frames began to emit a continuous signal, indicating that a package had been opened. DEA agents immediately executed a search warrant. However, when Somsuan opened the door and admitted the agents, Agent Aurilio noticed that the packages had not been opened. The agents told Somsuan that they had the wrong apartment, got directions to another apartment, and left. Agent Aurilio noticed Vanichrat speaking on the phone during this incident.

Meanwhile on the sixth, Vanichromanee flew on United Airlines from Chicago to New York City, where he met with Char Fong "Jimmy" Tom at the Hotel Edison. Tom rented a car and the two drove to Chicago, arriving on the afternoon of May 7. Upon their arrival, the two ate lunch at the Thai Star Cafe. While eating, Tom wrote his home phone number on a Thai Star Cafe card and gave it to Vanichromanee. Toward the end of the meal, Vanichromanee made a phone call.

On the afternoon of May 7, Vanichrat and Somsuan were in Somsuan's apartment. At some point, Vanichrat received a phone call. Following the call, Vanichrat loaded the five packages into the car of Choob Chaisri ("Choob"), Somsuan's brother who was visiting from Indiana. Vanichrat, Somsuan, and Choob then drove to the Thai Star Cafe, where Vanichrat and Vanichromanee transferred the five parcels from Choob's car to Tom's car. Tom drove off alone, and the four others returned to Somsuan's apartment.

About 6:30 p.m., the four left the apartment in Choob's car. DEA agents then executed a warrant to search Somsuan's apartment. They found Tinnagorn Chaisri ("Tinnagorn"), a relative of Somsuan and Choob, in the apartment. He related that the five parcels had been taken from the apartment by Choob, Somsuan, and a man who had recently arrived from Thailand. The agents discovered wrapping paper from the packages and passports belonging to Vanichromanee and Vanichrat, which

showed that both had recently arrived from Thailand together.

Vanichromanee, Vanichrat, Somsuan, and Choob returned to the apartment around 8:30 p.m. Choob let Somsuan out of the car near her car and then continued to drive around the building to the parking garage. DEA agents stopped Somsuan and escorted her up to her apartment. DEA agents Ekman and Labik followed Choob's car into the parking garage. Once Choob parked, the agents approached the car, identified themselves as federal narcotics agents, and asked the occupants for identification. The language barrier (none of the three spoke English) made communication difficult. The agents patted down the three men and searched the hatch section of the car for weapons. After approximately five to ten minutes, the agents were instructed via their two-way radio to bring the three up to Somsuan's apartment.

In the apartment, the three men sat on the couch with Tinnagorn and were permitted to smoke. Agent Ripley spoke with Somsuan, who related to him the events of the day, including the meeting with Vanichromanee at the Thai Star Cafe and his involvement with transferring the packages from Choob's car to the New York car. Following this interview, all of the apartment's occupants were taken to the Federal Building. Events in the apartment transpired during an additional five to ten minute period. Shortly after their arrival at the Federal Building, Agent Ekman had Choob empty his pockets. A DEA report indicates that $1,400 was taken from Vanichromanee at approximately 10:00 that evening.

On the basis of the preceding facts, Vanichromanee was found guilty on all five counts of the indictment involving him. He appeals.

II.

The district court denied Vanichromanee's motion to suppress after a hearing. Vanichromanee raises two issues on appeal related to his unsuccessful attempt to have certain evidence suppressed.

## A.

The first of these issues concerns the time when Vanichromanee was arrested and whether that arrest was based on probable cause. This issue is important here because at least two of the three items seized from his pockets—a Thai Star Cafe card bearing the name "Jimmy" and a phone number, a receipt for the Hotel Edison, and fourteen $100 bills—were later introduced at his trial. The Thai Star Cafe card was particularly damning because it led to Jimmy Tom, the government's principal witness. If the arrest was unlawful, then the three items seized—and all other evidentiary fruits—should have been suppressed.

Vanichromanee contends that the arrest took place in the parking garage of Somsuan's building; the government asserts that he was not arrested until he was in Somsuan's apartment. Vanichromanee counters that probable cause to support an arrest existed at neither time. The district court held that the parking garage detention was only an investigatory stop and that the arrest was in the apartment. Further, the district court held that probable cause existed to support the arrest at that time. We concur fully with the district court's conclusions.

■ It is clear that Vanichromanee and the two others were seized in the parking garage within the meaning of the Fourth Amendment: Agent Ekman testified that the three men would have been stopped had they attempted to leave. Mere detention, however, is not an arrest. A police officer may, short of an arrest, detain an individual briefly "in order to determine his identity or to maintain the status quo momentarily while obtaining more information," *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), if the officer has knowledge of "articulable facts sufficient to give rise to reasonable suspicion that [the] person had committed or is committing a crime," *United States v. Black*, 675 F.2d 129, 133 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983). *See also*

*Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion); *Michigan v. Summers*, 452 U.S. 692, 699 (1981); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, (1975); *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–1880, 20 L.Ed.2d 889 (1968); *United States v. Cordell*, 723 F.2d 1283, 1285 (7th Cir.1983), *cert. denied*, ___ U.S. ___, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984). The first question presented here, then, is whether the parking garage detention was a brief, investigatory stop requiring a reasonable suspicion of a crime or an arrest requiring probable cause.

■ In the parking garage, Agents Ekman and Labik stopped their car behind Choob's car; they approached the other car as the three men exited it; they informed the three that they were federal narcotics agents and requested identification; and, finally, they performed pat down searches and looked into the hatch of Choob's car for weapons. None of these acts individually or in combination placed any of the three under arrest. *Cf. Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

It is clear that the purpose of the detention was to identify the three men and to ascertain their relationship to the apartment and Somsuan. The agents attempted to obtain this information through interrogation, but this proved difficult because none of the three spoke English. Detention and interrogation as to identity and the connection of the three to Somsuan was within the bounds of an investigatory stop. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); W. LaFave, *Search and Seizure* § 9.2, at 36–37 (1978).

After five to ten minutes, and while still attempting to elicit information, the agents were instructed to bring the three men up

to Somsuan's apartment. That the three were moved from one spot of temporary detention to another did not vitiate the investigatory nature of the stop. The Supreme Court has held that relocation is permissible for reasons of security and safety. *See Florida v. Royer,* 103 S.Ct. at 1328; *Pennsylvania v. Mimms,* 434 U.S. 106, 110–11, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977). Relocation may be permissible for other reasons as well (e.g., comfort or convenience). *Cf. United States v. Mayes,* 524 F.2d 803 (9th Cir.1975) (detainee moved from brush-covered range to Border Patrol station pending verification of story); *United States v. Richards,* 500 F.2d 1025 (9th Cir.1974) (lawful to move detainees from airport runway to terminal), *cert. denied,* 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975); *United States v. Van Lewis,* 409 F.Supp. 535, 545 (E.D.Mich. 1976) (move to quieter place for questioning), *aff'd,* 556 F.2d 385 (6th Cir.1977); W. LaFave, *Search and Seizure* § 9.2, at 41 (1978). The ultimate question is not why the detainees were moved, but whether the move made the stop more intrusive. We note that the transfer here was not to a more institutional setting, such as a police station or interrogation room, but to a residential dwelling unit. Such a transfer is unlikely to raise the intrusiveness of the stop to the level of an arrest. *Cf. Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (arrest where defendant taken to police station and placed in interrogation room); *United States v. Covelli,* 738 F.2d 847 at 852–853 (7th Cir.1984) (arrest occurred when defendant taken into custody, read *Miranda* rights, strip-searched, and placed in cell); W. LaFave, *Search and Seizure* § 9.2, at 41 (1978).

■ Finally, the detention was "temporary and last[ed] no longer than necessary to effectuate the purpose of the stop." *Florida v. Royer,* 103 S.Ct. at 1325. A detention does not become an arrest just because it exceeds the usual two to three minute investigative stop. *See, e.g., United States v. Ogden,* 703 F.2d 629 (1st Cir. 1983) (30 minutes lawful); *United States v.*

*Bautista,* 684 F.2d 1286 (9th Cir.1982) (investigative stops not limited to three minutes), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983); *United States v. Richards,* 500 F.2d 1025 (9th Cir.1974) (hour detention upheld), *cert. denied,* 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975). The test for determining whether the length of the detention is lawful is the reasonableness of the time involved. *See United States v. Richards,* 500 F.2d at 1029. Here, the five to ten minutes spent in the parking garage and the additional five to ten minutes in the apartment was a reasonable amount of time, given the language barrier, necessary to effectuate the purposes of identifying the three men and, once identified, of maintaining the status quo until their role in the day's events could be clarified by completing the preliminary questioning of Somsuan. *Cf. Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (home owner detained while search warrant of home executed); *United States v. Ogden,* 703 F.2d at 634 (detention while all parties questioned); *United States v. Mayes,* 524 F.2d at 806 (detention while story verified); *United States v. Richards,* 500 F.2d at 1029 (detention while story verified). The district court did not err in holding that the parking garage detention, and its continuation in Somsuan's apartment, was an investigatory stop and not an arrest.

■ We also agree with the district court that the stop was based on a reasonable suspicion that the three men may have committed a crime. At the time of the stop, DEA agents knew the following: five packages containing heroin had been sent to Somsuan from Thailand; the postal inspector had seen an oriental man open one of the packages; a DEA agent saw Vanichrat (unknown at the time) talking on the phone; Vanichromanee and Vanichrat's passports—showing their recent arrival from Thailand together—were found in the apartment; and Tinnagorn had related that a man recently arrived from Thailand had taken the packages. These facts gave the agents reason to suspect that Vanichroma-

nee and/or Vanichrat was involved in a conspiracy with Somsuan to import heroin. Either Vanichrat or Vanichromanee would fit Tinnagorn's description of a man recently arrived from Thailand; and either could have been the oriental man seen by the postal inspector. When Somsuan returned with three oriental men, the DEA agents could reasonably believe that at least two of them were involved in the conspiracy. The agents could, therefore, legally detain the occupants of the car to learn their identity and question them about their connection with Somsuan.

■ The government concedes, as it must, that Vanichromanee was arrested while he was in Somsuan's apartment. Vanichromanee contends that the agents lacked probable cause to justify an arrest at that time. We review the district court's findings relating to probable cause for clear error. *United States v. Covelli,* 738 F.2d at 853; *United States v. Ganter,* 436 F.2d 364, 368 (7th Cir.1970).

■ Vanichromanee bases his argument on the fact that the government knew only that five packages of heroin had been sent to Somsuan's apartment, that a man recently arrived from Thailand took the packages, and that Vanichromanee had recently come from Thailand with Vanichrat. But the agents knew more than this when they arrested Vanichromanee. Somsuan had told them, while still in the apartment, that Vanichrat had received a phone call and that immediately thereafter she, Choob, and Vanichrat had loaded the packages into Choob's car and had taken them to the Thai Star Cafe, where Vanichrat met Vanichromanee and an unknown man (Jimmy Tom). She further related that Vanichrat and Vanichromanee transferred the packages to Tom's car. This information tied Vanichromanee to the illegal activity and, when viewed in combination with the information already known to the agents, provided probable cause for Vanichromanee's arrest.

Vanichromanee attempts to discredit the district court's reliance on Somsuan's statement by asserting that she did not give the agents the relevant information to find probable cause until after she was taken to the Federal Building. To support this argument, Vanichromanee points to the testimony of two witnesses at the suppression hearing that allegedly contradicted the testimony of Agent Morley, upon which the district court relied. We note that credibility determinations are best made by the district court and we will not upset those determinations unless they are manifestly erroneous. *Soria v. Ozinga,* 704 F.2d 990, 995 n. 6 (7th Cir.1983); *United States v. Mattes,* 687 F.2d 1039, 1042 (7th Cir.1982). We find no manifest error here.

Vanichromanee first relies on Somsuan's testimony that she did not speak very much English, that the officers spoke to her only in English, and that she did not tell them at the apartment where she had gone with the pictures. From this testimony, Vanichromanee concludes that it would have been impossible for Somsuan to relate the information to the agents that Agent Morley testified she related. Vanichromanee passes over Somsuan's testimony that she was asked questions in the apartment, though she was asked more questions later when she reached the Federal Building. She also testified that she was able to understand the agents' questions when they spoke slowly and, with the assistance of neighbors called in to help translate, she was able to answer those questions. One of the statements Somsuan explicitly recalled making was that "these things [the heroin-filled picture frames] are not mine and belong to the other two guys." This statement alone provided probable cause for the arrest of Vanichromanee and Vanichrat. To the extent that Somsuan's testimony concerning the time and place she told the agents where the pictures were taken contradicted Agent Morley's testimony, the district court could credit one version over the other.

Second, Vanichromanee refers to Agent Ekman's testimony that "I do not believe any of them were questioned [at the apartment] because we ascertained that nobody could understand anybody . . . ." Read in the context of the examination, it is abun-

dantly clear that Agent Ekman was referring only to the three men who had been detained in the parking garage and then relocated to the apartment. Agent Ekman's testimony makes no reference to Somsuan as even being in the same room as the three men. Thus, it is entirely possible that Somsuan talked to Agent Ripley in another room or during the 5–10 minutes that Agent Ekman was in the parking garage. Agent Ekman's testimony in no way contradicts a finding that Somsuan was questioned in her apartment. Indeed, applying Agent Ekman's testimony to Somsuan would contradict her testimony that she understood some English and did talk to the DEA agents in her apartment.

In sum, we find no error in the district court's denial of Vanichromanee's motion to quash arrest and to suppress evidence.[2]

### B.

■ The second suppression issue raised by Vanichromanee relates to a search made of his attache case on May 28, 1982. Vanichromanee apparently left the attache case in Somsuan's apartment before they left for dinner, and she subsequently turned it over to the DEA. On May 28, the government obtained a warrant authorizing a search of the attache case for "documents, papers, receipts, and other writings which are evidence of a conspiracy to violate Title 21, U.S.C., Section 963 [conspiracy to import heroin]." This search produced a United Airlines ticket, a Japan Air Lines ticket, and a receipt for the Hotel Edison. Vanichromanee contends that the warrant was so broad that it allowed DEA agents to go on a fishing expedition in violation of the Fourth Amendment. *See Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976); *United States*

*v. Malik,* 680 F.2d 1162, 1165 (7th Cir.1982). We disagree.

■ The affidavit submitted in support of the warrant outlined the facts concerning Vanichromanee's involvement in the alleged conspiracy to import heroin. Though Vanichromanee asserts that the warrant was overly broad because it did not specify the precise documents sought, an attache case would be a logical place to store hotel receipts, airline tickets, and other writings that might evidence a conspiracy to import heroin. A search warrant does not have to specify the precise documents sought (often an impossible task) in order to satisfy the Fourth Amendment. Here, the warrant authorized only the seizure of writings related to the conspiracy to import heroin; it did not authorize a general, exploratory rummaging through Vanichromanee's belongings to find any evidence of any crime. The warrant was sufficiently specific to meet Fourth Amendment requirements. *Andresen v. Maryland,* 427 U.S. at 480–82, 96 S.Ct. at 2748–49; *United States v. Malik,* 680 F.2d at 1165.

### III.

Vanichromanee next contends that the district court abused its discretion by denying his motion for a severance of his case from that of his codefendant Naovarat Vanichrat under Federal Rules of Criminal Procedure 8 and 14. We disagree.

■ Vanichromanee first argues that there was improper joinder of the two defendants under Rule 8(b). Contrary to Vanichromanee's position, however, the indictment does not charge each defendant with similar, but unrelated, offenses. Rather, the indictment charges each defendant with several substantive offenses, and it links these offenses with two counts

---

**2.** There is some question as to when the three items found in Vanichromanee's pockets were seized. By holding the items admissible, the district court *sub silentio* held that they were seized after the arrest in the apartment. We do not find this holding clearly erroneous. Agent Morley testified that a DEA report showed that $1,400 was taken from Vanichromanee at approximately 10:00 p.m. in the Federal Building.

Two other DEA reports show that the same agent who seized the $1,400 also seized the Thai Star Cafe card and the Hotel Edison receipt. Agent Ekman testified that he had Choob empty his pockets only after they reached the Federal Building. It was not clearly erroneous to conclude that all of the items were seized at the Federal Building at the same time rather than in Somsuan's apartment or in the parking garage.

of conspiracy. Vanichromanee asserts that the conspiracy counts are shams, but there is no evidence to suggest that the government added these counts in bad faith. Indeed, the conspiracy counts were clearly appropriate on these facts. We hold, therefore, that joinder was proper. *See United States v. Ras*, 713 F.2d 311, 315 (7th Cir. 1983); *United States v. Garza*, 664 F.2d 135, 142 (7th Cir.1981), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854 (1982); *United States v. Donaway*, 447 F.2d 940, 943 (9th Cir.1971).

■ Assuming that joinder was proper, Vanichromanee next asserts that the district court further erred by denying severance under Rule 14. The district court's decision not to sever will be reversed only if it was an abuse of discretion, which requires a showing by Vanichromanee of compelling prejudice. *See United States v. Tedesco*, 726 F.2d 1216, 1219 (7th Cir.1984); *United States v. Burton*, 724 F.2d 1283, 1286 (7th Cir.1984).

■ Vanichromanee points to two incidents that he claims prejudiced his trial: 1) he was called to the stand by Vanichrat, but asserted his Fifth Amendment right not to be a witness against himself, and 2) Vanichrat testified on his own behalf, inculpating Vanichromanee in the process. Neither of these incidents reveals any compelling prejudice that would have required severance.

Calling Vanichromanee to the witness stand in a jury trial might well have prejudiced his trial, *see United States v. Hansen*, 583 F.2d 325, 330–31 (7th Cir.), *cert. denied*, 439 U.S. 912, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *United States v. Barney*, 371 F.2d 166, 170–71 (7th Cir.1966), *cert. denied*, 387 U.S. 945, 87 S.Ct. 2080, 18 L.Ed.2d 1333 (1967); *United States v. Echeles*, 352 F.2d 892, 897–98 (7th Cir. 1965), but this was not a jury trial. A district court judge trying a bench trial knows that every defendant has a constitutional right not to be called as a witness and that no undue inferences are to be made when a defendant exercises this right. That Vanichromanee was called to the stand and refused to testify did not, therefore, in the context of this bench trial, prejudice his case or require a severance.

■ Vanichrat's testifying also did not prejudice Vanichromanee's defense. Indeed, Vanichromanee initially wanted a severance so that Vanichrat could testify, which is exactly what he did. A defendant is not automatically prejudiced when a codefendant testifies. *See, e.g., United States v. Ambrose*, 740 F.2d 505 at 512–513 (7th Cir.1984) (no severance required where pretrial statement of witness-defendant used to impeach him, although statement also implicated codefendants); *United States v. Wilson*, 657 F.2d 755, 765–66 (5th Cir.1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982); *Joyner v. United States*, 547 F.2d 1199, 1201 (4th Cir.1977); *United States v. Miller*, 513 F.2d 791, 793 (5th Cir.1975); *United States v. Meyer*, 404 F.2d 254, 255 (9th Cir.1968), *cert. denied*, 394 U.S. 989, 89 S.Ct. 1476, 22 L.Ed.2d 764 (1969).

Moreover, Vanichrat's testimony was not inconsistent with Vanichromanee's defense. Vanichrat testified that he knew Vanichromanee in Thailand, that Vanichromanee paid all of his travel expenses, that Vanichromanee knew the packages were being sent to Somsuan, but did not tell him who was sending the packages, and that he was in the United States sightseeing while Vanichromanee was inspecting machinery for his business. Vanichrat presented a defense of no knowledge of illegal activities— he was coincidentally in the wrong places at the wrong times. His testimony did not directly implicate Vanichromanee, but merely corroborated other government evidence. Thus, the district court could have credited Vanichrat's story and still have accepted Vanichromanee's defense (gleaned from his closing argument—he presented no witnesses) that he, too, was in the wrong places coincidentally, that he had no knowledge of illegal activity, and that the conspiracy was really between Somsuan, Tom, and Naranong. Because the defenses were not mutually antagonistic, no prejudice resulted. *United States v. Banks*, 687

F.2d 967, 973 (7th Cir.1982), *cert. denied,* 459 U.S. 1212, 103 S.Ct. 1208, 75 L.Ed.2d 448 (1983).

Finally, to the extent that Vanichrat's testimony can be viewed as implicating Vanichromanee, Vanichrat was an adverse witness available for cross-examination. No severance was required. *See United States v. Ambrose,* at 513.

Accordingly, we hold that Vanichromanee was not denied a fair trial by the district court's failure to sever.

## IV.

Finally, Vanichromanee challenges the sufficiency of the evidence on Counts II and V, the interstate racketeering counts. 18 U.S.C. § 1952(a)(3), (b). Count II charged Vanichromanee with traveling from Chicago to New York City on May 6, and Count V charged him with returning to Chicago on May 6 and 7.

■ The gravamen of a § 1952 charge is interstate travel with the intent to promote, carry on, or further an unlawful activity, and the performance of some act after the interstate travel designed to promote, carry on, or further that illegal purpose. *United States v. Briggs,* 700 F.2d 408, 417 (7th Cir.), *cert denied,* 461 U.S. 947, 103 S.Ct. 2199, 2463, 77 L.Ed.2d 1307 (1983); *United States v. Rizzo,* 418 F.2d 71, 74 (7th Cir.1969), *cert. denied,* 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260 (1970). Vanichromanee alleges three insufficiencies in the government's proof: 1) a failure to prove that Vanichromanee traveled from Chicago to New York; 2) a failure to prove that the travel, if proved, was significant; and 3) a failure to prove any illegal acts following each instance of interstate travel. We find the evidence sufficient.

■ The government clearly proved that Vanichromanee traveled from Chicago to New York City on May 6. Records from the Holiday Inn demonstrated that Vanichromanee was in Chicago from May 2 through May 6. Vanichrat's testimony further supported this documentary evidence. A receipt from the Hotel Edison, and the testimony of Jimmy Tom, proved that Vanichromanee was in New York City on the afternoon of May 6. A United Airlines ticket for Flight 325 on May 6, made out to "P. Vanichromanee," showed how Vanichromanee traveled from Chicago to New York.

■ It is also clear that the interstate travel here was not "fortuitous or isolated and incidental." *United States v. Raineri,* 670 F.2d 702, 718 (7th Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982). One instance of interstate travel will suffice to provide a basis for conviction under § 1952 if the defendant travels to further the illegal activity. *See United States v. Craig,* 573 F.2d 455, 488–89 (7th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1978); *United States v. Peskin,* 527 F.2d 71, 75 (7th Cir.), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). Vanichromanee's trip to New York was in furtherance of the illegal conspiracies and was not, therefore, merely incidental travel. *See United States v. Peskin,* 527 F.2d at 75. *Cf. United States v. Isaacs,* 493 F.2d 1124 (7th Cir.) (mere fortuity that check drawn on Illinois bank and cashed in Illinois was cleared through the St. Louis Federal Reserve Bank), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *United States v. McCormick,* 442 F.2d 316 (7th Cir.1971) (*per curiam*) (fortuity that gambling activity advertised for salesmen in newspaper with out-of-state subscribers); *United States v. Altobella,* 442 F.2d 310 (7th Cir.1971) (fortuity that victim raised extortion money by cashing out-of-state check).

The government also demonstrated that acts in furtherance of the illegal activity occurred after each instance of interstate travel. Jimmy Tom testified that in New York he met with Vanichromanee to confirm that the packages were ready to be picked up. In addition, Tom rented a car to drive to Chicago to pick up the packages, and during that trip Tom agreed to purchase an extra package from Vanichromanee. Each of these incidents was an act in furtherance of the alleged conspiracies. Once in Chicago, the testimony of Tom, Somsuan, and Vanichrat shows that Vanichromanee assisted in the transfer of the

five packages from Choob's car to Tom's car, again in furtherance of the conspiracy to distribute heroin.

The evidence is sufficient to support both counts of interstate racketeering.

## V.

For the reasons expressed above, the judgments of conviction are affirmed.