**UNITED STATES of America, Appellee,**

v.

**Edgardo GIORGI, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Gilberto OCASIO–GONZALEZ, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Pedro M. GONZALEZ–SANCHEZ, Defendant, Appellant.**

**Nos. 85–1326, 85–1361 and 85–1377.**

United States Court of Appeals, First Circuit.

Heard Dec. 8, 1987.

Decided March 7, 1988.

Rehearing Denied in No. 85–1377 April 14, 1988.

Victor Amador, San Juan, P.R., for appellant Pedro M. Gonzalez-Sanchez.

Peter John Porrata by Appointment of the Court, with whom Law Offices of Peter John Porrata, Old San Juan, P.R., was on brief, for appellant Gilberto Ocasio-Gonzalez.

Jose Antonio Lugo, with whom Lugo & Berkowitz, Hato Rey, P.R., was on brief, for appellant Edgardo Giorgi.

Jorge L. Arroyo, Asst. U.S. Atty., Crim. Div., with whom Daniel F. Lopez-Romo, U.S. Atty., and Salixto Medina Malave, Asst. U.S. Atty., San Juan, P.R., were on brief, for appellee.

Before BOWNES and BREYER, Circuit Judges, and LAFFITTE,* District Judge.

BOWNES, Circuit Judge.

This appeal arises out of appellants' convictions for conspiracy to commit and aiding and abetting the commission of mail fraud in violation of 18 U.S.C. §§ 2, 371 & 1341. The thirteen-count indictment detailed an arson for profit scheme involving the burning of Caribbean International, Inc., a wholesale dry goods business, located in Bayamon, Puerto Rico, and the submission of false claims to Puerto Rican–American Insurance Company (hereinafter PRAICO). Appellants Edgardo Giorgi (hereinafter Giorgi) and Gilberto Ocasio Gonzalez (hereinafter Ocasio) were found guilty on the conspiracy count; appellant Pedro Gonzalez Sanchez (hereinafter Gonzalez) was found guilty on the conspiracy count and on three substantive counts. We affirm all the convictions.

## I. FACTS

Early in the morning of September 1, 1980, the Caribbean International warehouse erupted in a series of explosions, burst into flames and burned to the ground. Subsequent to that fire, Wilfredo Rivera Diaz (hereinafter Rivera Diaz), the owner of Caribbean International, instituted a claim against his insurer, PRAICO, with whom he had insured his business under a multiperil policy with limits of $600,000 for property losses resulting from fire and other causes, and $200,000 for business interruption.

According to the evidence presented by the government, the Caribbean International fire was not accidental. The government described the events surrounding the destruction of the business as follows. The fire resulted from a scheme developed by Rivera Diaz and other members of the Latorre gang, a criminal organization headed by Jose Luis Latorre and engaged in both the theft of vans loaded with valuable merchandise and the commission of arson for profit. Planning for the Caribbean International fire began in the summer of 1980 and was intended to solve the problem of an increasingly unprofitable business. At an early meeting in which the responsible parties discussed the alternatives to arson, appellant Gonzalez, an attorney, agreed to handle the Caribbean International case in return for a twenty-five percent fee. Gonzalez advised against filing in bankruptcy court (pursuant to which the court would appoint a trustee who would supervise the affairs of the business) and endorsed the original idea of burning the warehouse and collecting on the insurance policy.

During July and August of 1980, Rivera Diaz and his associates placed large orders for merchandise with the regular suppliers of Caribbean International. Once received, the goods were transported along with oth-

er valuable merchandise previously stored at Caribbean International to warehouses owned by various members of the Latorre gang. Rivera Diaz also sold some of the merchandise to businesses located throughout Puerto Rico. These transactions both engendered large profits and, more importantly, created documentation which could later be submitted to the insurance company.

Within the same time period, Rivera Diaz had a series of meetings with Gil Arzola, a member of both the criminal investigations arm of the Puerto Rico police department and the Latorre gang, during which Arzola mentioned that he knew people at police headquarters who could fix the investigation of the anticipated fire to preclude any finding of criminal activity. Arzola named, among others, appellant Ocasio.

On the appointed day, Jose Luis Latorre, his half brother Carlos Latorre and appellant Giorgi met to set fire to the Carribbean International warehouse. The torching party obtained several plastic containers, filled them with gasoline, placed them in the warehouse and then set the warehouse aflame. The destruction was widespread.

As planned, Ocasio conducted the official investigation of the fire. He wrote a report in which he found the cause of the destruction to be accidental. Several months thereafter, Rivera Diaz filed a claim against PRAICO through his attorney, Gonzalez. To substantiate that claim, Gonzalez prepared a list of the creditors of Caribbean International and reconstructed the inventory of the business. The total loss documented through those efforts fell short of the policy limit. Rivera Diaz and his associates therefore prepared false invoices in the name of companies associated with the Latorre gang in order to establish further loss; the alleged creditors of Rivera Diaz then filed collusive suits against Caribbean International in the Superior Court of Puerto Rico.

Concurrent with these efforts to falsify the records of Caribbean International, Benjamin Acosta—an independent adjuster hired by PRAICO—conducted an investigation of the fire. During the course of that investigation, he exchanged several mailings with Gonzalez. Settlement negotiations between Caribbean International and PRAICO commenced and continued over the course of several months. In the interim, the F.B.I. instituted an investigation of the fire and recommended a postponement of the settlement negotiations pending conclusion of the F.B.I. inquiry. That inquiry resulted in an indictment against appellants and six other codefendants. Following a fourteen-day trial, the jury rendered its verdict, and appellants filed this appeal. We consider the issues raised by the parties below.

## II. THE PLEA AGREEMENT

Appellant Giorgi first argues that a prior plea agreement precluded his prosecution in the instant case. The disputed agreement arose out of an indictment for the theft or hijacking of trucks or vans in interstate commerce; it included a commitment by the government not to prosecute Giorgi "for any criminal acts related to thefts or hijackings of vans." Giorgi contends that the criminal acts at issue in the present case bear an intimate relation to the van thefts mentioned in the plea agreement and hence are protected under the terms of that agreement. Conversely, the government maintains that the written language of the agreement clearly does not include the crimes herein at issue and that a liberal construction barring prosecution would undermine the reasonable expectations of the parties. The trial court denied Giorgi's motion to dismiss, finding the allegation of breach of the plea agreement to lack merit. Although we do recognize a facial ambiguity in the language of the agreement, we affirm the holding below.

We are guided in our interpretation of the disputed plea agreement by general principles of contract law. In *United States v. Gonzalez–Sanchez*, 825 F.2d 572 (1st Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987), a case involving many of the same actors as the current appeal, we considered, within a contractual framework, a claim by a defendant

that his plea agreement in a previous case barred the contested prosecution:

> When a defendant has entered into a plea agreement with the government, the court must ensure that he receives what is reasonably due him under the agreement. Contractual principles apply insofar as they are relevant in determining what the government "owes" the defendant. If the defendant lives up to his end of the bargain, the government is bound to its promises.

825 F.2d at 578 (footnotes omitted).[1] *Accord United States v. Baldacchino*, 762 F.2d 170, 179 (1st Cir.1985) ("Though a matter of criminal jurisprudence, plea bargains are subject to contract law principles insofar as their application will insure the defendant what is reasonably due him.") (citations omitted).

This contractual framework, however, has been expanded to include a recognition of the unique nature of a plea agreement. While such agreements serve an important role in the efficient operation of the criminal justice system, they also effect a waiver of defendants' rights: "However important plea bargaining may be in the administration of criminal justice, our opinions have established that a guilty plea is a serious and sobering occasion inasmuch as it constitutes a waiver of the fundamental rights to a jury trial ... to confront one's accusers ... to present witnesses in one's defense ... to remain silent ... and to be convicted by proof beyond all reasonable doubt...." *Santobello v. New York*, 404 U.S. 257, 264, 92 S.Ct. 495, 500, 30 L.Ed.2d 427 (1971) (Douglas, J., concurring) (citations omitted). *See also United States v. Garcia*, 698 F.2d 31, 37 (1st Cir.1983) ("A guilty plea is a waiver of fundamental constitutional rights...."); *Correale v. United States*, 479 F.2d 944, 947 (1st Cir.1973) (same).

In *Santobello*, the Court recognized the necessity of judicial safeguards to protect the integrity of a plea agreement: "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." 404 U.S. at 262. This court has interpreted *Santobello* to place a heavy burden upon the government: "[T]he most meticulous standards of both promise and performance must be met by prosecutors engaging in plea bargaining." *Correale*, 479 F.2d at 947. We have cautioned the government to avoid narrow interpretations of language within a plea agreement where such a construction would violate the spirit of that agreement. *See Garcia*, 698 F.2d at 37 ("'A plea agreement is not an appropriate context for the Government to resort to a rigidly literal approach in the construction of language.'") (quoting *United States v. Bowler*, 585 F.2d 851, 854 (7th Cir.1978)) (citation omitted). Further, we have imposed a duty upon the government, when drafting an agreement, to present a recommendation "which is lawful, clear and consistent both internally and with respect to the underlying promise." *Correale*, 479 F.2d at 949.

Despite this judicial mandate, not every plea agreement rises to a model level of clarity. Courts are often required to interpret agreements which present ambiguities not only as applied but on the face of the agreement as well. We have not as yet directly addressed the issues presented by a facially ambiguous agreement. Given the relative interests implicated by a plea bargain, we find that the costs of an unclear agreement must fall upon the government. While we affirm the general applicability of contract law principles, we hold that the government must shoulder a greater degree of responsibility for lack of clarity in a plea agreement. *Accord United States v. Harvey*, 791 F.2d 294, 300 (4th Cir.1986) ("[B]oth constitutional and supervisory concerns require holding the Government to a greater degree of responsibility than the defendant (or possibly than would be either of the parties to commercial contracts) for imprecisions or ambigui-

---

1. Contrary to the present inquiry, the court in *Gonzalez-Sanchez* focused on whether the *defendant* had breached the plea agreement there- by releasing the government from its obligations. 825 F.2d at 578.

ties in plea agreements.") (citations omitted); *United States v. Fields,* 766 F.2d 1161, 1168 (7th Cir.1985) (same).

With these principles in mind, we turn to the facts of this case. The plea agreement in question arose out of Giorgi's indictment for the theft and hijacking of trucks or vans in interstate commerce. In brief, the indictment returned by the grand jury on July 22, 1983, charged Giorgi with conspiring to and covert acts in furtherance of (1) hijacking or stealing vans loaded with valuable merchandise (specifically Olay cosmetic and health products) and storing that merchandise in designated warehouses, and (2) carrying away the stolen merchandise in interstate transport. Subsequent to negotiations between Giorgi, his attorney, and the government, the parties entered into a plea agreement whereby Giorgi agreed to plead guilty to counts one, two and four of the indictment in exchange for the following promises by the government: (1) that the government would not request that Giorgi testify, (2) that the government would not make any sentencing recommendation, (3) that the government would dismiss count six of the indictment, and (4) that the government "agrees not to prosecute defendant, EDGARDO GIORGI, for any criminal acts related to thefts or hijackings of vans committed by him prior to July 22, 1983...." At the change of plea hearing in January, 1984, the district court established that Giorgi's plea was both knowing and voluntary. The court discussed the terms of the agreement and solicited Giorgi's understanding of each provision. None of the participants at the hearing raised the question of subsequent prosecutions during the discussion of the parties' reciprocal obligations under the agreement.

Less than five months after the change of plea hearing, on June 12, 1984, the grand jury returned a second indictment under which Giorgi was charged with conspiracy to commit and aiding and abetting in the commission of mail fraud. Giorgi moved to dismiss the indictment, claiming

that his previous plea agreement with the government barred further prosecution. Giorgi argued that the alleged arson for profit and mail fraud detailed in the indictment were "alleged *criminal acts intimately related* to the theft or hijacking of vans which formed part of the Plea Agreement of January, 1984 and for which the defendant pled guilty." (Emphasis in original). Giorgi concluded that "the government is barred, by the express and implied terms of the Plea Agreement to prosecute defendant Giorgi."

The court ordered a hearing on November 2, 1984, to construe the meaning of the plea agreement. Magistrate Castellanos presided and both Giorgi's former attorney Francisco Dolz and Assistant United States Attorney Salixto Medina testified. Dolz stated that if the government had not intended to include the crimes of arson and mail fraud within the reach of the disputed language then he "was fooled"; Medina stated that the government had no such intention at the time of the agreement. After considering both the document itself and the above testimony, Magistrate Castellanos issued a report and recommendation which found that although the agreement as drafted was facially ambiguous,[2] it could not be interpreted to preclude the prosecution in question: "The facts presented do not give grounds ... to broaden the parameters of the plea as one including a somewhat type of immunity [sic] for almost any imaginable federal offense.... [T]o stretch and construe the meaning of the plea to include the present charges without any other and more convincing evidence, could not stand muster."

Giorgi filed a notice of objections to the report on December 18, 1984. Because the court reporter was unable to provide a complete transcript of the evidentiary hearing due to a faulty recording, the parties filed a "Statement of Undisputed Facts for Motion to Dismiss Indictment." In that statement, Dolz presented his understanding of the scope of the agreement as substantiat-

---

**2.** Specifically, the report stated: "It has to be admitted that, as drafted, the phrase 'related to theft and hijacking of vans' as such, is open-end-ed and could encompass anything including mail fraud and arson."

ed by allegedly contemporaneous notes of the meeting.[3] Medina testified that not only had the government no intention of including the crimes of mail fraud or arson within the agreement, but that at the time of the change of plea session the government did not have a full idea of Giorgi's participation in those crimes.[4]

On February 22, 1985, the district court issued an order denying Giorgi's motion to dismiss the indictment. The court found not only that the agreement did not cover the crimes herein at issue, but also that the agreement itself was unambiguous: "[C]odefendant's contention that the government has breached the plea agreement lacks merit. The language is clear, and the nature of the plea agreement was adequately disclosed." The trial court further stated that the agreement "cannot be stretched to include charges of different nature and arising from different facts as the ones contemplated by 18 U.S.C. 1341."

■ Our review of the holding below is limited. This court has held that a question of the interpretation of the terms of a plea agreement is an issue of fact to be resolved by the district court. *See United States v. Khoury*, 755 F.2d 1071, 1073 (1st Cir.1985) (citations omitted). Our consideration of the trial court's finding that the government did not breach the plea agreement by instituting the present action is governed by the clearly erroneous standard. *Id.* (citations omitted). We find that, although the agreement did contain a facial ambiguity, the construction of that agreement by the court below was consistent with the reasonable expectations of the parties.

We begin our analysis with an inquiry into whether the reasonable expectations of the parties can be ascertained under an objective standard by examining the language of the plea agreement. *See Fields*, 766 F.2d at 1168. Unlike the district court, we find the words unclear. The phrase "any criminal acts *related to* thefts or hijackings of vans" (emphasis added) cuts widely and could conceivably extend to the criminal acts now at issue. Our examination of this question is guided by the unique concerns raised by a plea agreement.

The criminal activity which formed the basis of the conviction which Giorgi now contests involved arson for profit and mail fraud. The crux of the scheme was (1) the burning of the Caribbean International warehouse and (2) the substantiation of property losses to the insurer through the submission of both legitimate and fraudulent invoices. The government presented evidence that the only motives for the burning of Caribbean International were that the business had become unprofitable and had accrued a large debt, and that the business was covered by a large insurance policy. Although it was established at trial that much of the merchandise actually in the warehouse at the time of the fire had been obtained through the theft or hijacking of vans, that fact was not central to the scheme. Rather, the plan focused on arson and insurance fraud. The success of the scheme rested on the destruction of the warehouse and the production of sufficient

3. Dolz's handwritten notes, which were admitted by the court solely to refresh the witness's recollection, listed the following crimes as protected under the terms of the plea agreement:
1) arson
2) shooting in Vega Baja
3) a warehouse arson and scheme to collect insurance policy by using mails
4) theft; a hijacking of rubbing alcohol, tuna fish, razors, pampers, cream, powder, real kill, Felipe II, auto batteries, cigarettes, shaeffer beer, rice, tennis shoes, cooking oil, misc. merchandise, lobsters.

4. In the "Statement of Undisputed Facts for Motion to Dismiss Indictment," the government

offered as proof of its lack of knowledge of Giorgi's participation in the mail fraud a description of its internal procedure concerning investigation, assessment and institution of legal proceedings. The government argued that since the United States Attorney had not even advanced to the second stage of preparing a report assessing the mail fraud cases, those cases could not have formed a part of the plea agreement. We disagree. Evidence of government practice would be relevant only if appellant were aware of that practice and might reasonably expect it to effect the terms of the plea agreement. *See United States v. Cook*, 668 F.2d 317, 321 n. 5 (7th Cir.1982).

invoices to substantiate the insurance claim—not on the source of the merchandise within the warehouse at the time of the fire.[5]

These facts lead us to conclude that no party to the plea bargain could reasonably expect the resultant agreement to effect Giorgi's exposure on charges of arson and mail fraud. Any mistaken belief held by Giorgi was purely subjective and poses no bar to the instant prosecution. *See United States v. Oliverio*, 706 F.2d 185, 187 (6th Cir.1983) (defendant "cannot now rely on his mistaken subjective impression of the effect of his earlier guilty plea as a bar to prosecution on totally unrelated charges...."); *cf. In re Grand Jury Proceedings*, 819 F.2d 984, 986–87 (11th Cir. 1987) (fact that defendant unintentionally misled by government does not justify reading additional terms into otherwise unambiguous agreement). As in *United States v. Fields*, 766 F.2d at 1169–71, where the court upheld the government's interpretation of a facially ambiguous plea agreement, Giorgi failed to communicate his interpretation of the agreement at the time of the change of plea hearing. Although Giorgi's attorney prepared a list of specific crimes which he believed the agreement covered, no attempt was made to incorporate that list into the agreement itself. *Compare United States v. Harvey*, 791 F.2d at 302–03 (read plea in favor of defendant to bar prosecution where defendant made clear and contemporaneous manifestations of his understanding of agreement). Nor has appellant alleged any misleading oral representations by the government. *See In re Arnett*, 804 F.2d 1200, 1203 (11th Cir.1986) (construe agreement against government on basis of contemporaneous oral representations by Assistant United States Attorney). We therefore find that the plea agreement poses no bar to the instant case.

## III. PROSECUTORIAL CONDUCT BEFORE THE GRAND JURY

Gonzalez and Ocasio allege prosecutorial misconduct as a basis for the reversal of

their convictions. The district court denied their pretrial motion for dismissal of the indictment despite a finding of "reprehensible conduct" by the prosecutor. Appellants argue that the cumulative effect of numerous errors prejudiced the grand jury and necessitates a dismissal of the indictment. They assign four specific grounds of error: (1) that the prosecution vouched for the credibility of a key witness; (2) that the prosecution discussed prejudicial events irrelevant to the charges at issue; (3) that the prosecution asked leading questions; and (4) that the prosecution requested the grand jury to indict a subsequent codefendant for a refusal to cooperate with the government's investigation. We find each of these claims without merit, whether viewed individually or in the aggregate, and we therefore affirm the holding of the court below.

We note first the apparent bar to the instant action posed by *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). In *Mechanik*, the Court reversed the dismissal of an indictment after a conviction on drug related offenses and conspiracy. The defendants challenged their indictment on the grounds of Federal Rule of Criminal Procedure 6(d); they argued that the simultaneous presence of two witnesses before the grand jury violated the rule, tainted the indictment and required that the court set aside any count of the verdict that corresponded to a tainted portion of the indictment. Although the Court assumed arguendo that the joint testimony of the witnesses did violate Rule 6(d), it refused to reverse the conviction. The Court held that the guilty verdict rendered by the petit jury established beyond a reasonable doubt not only that probable cause to charge did exist but that the defendants were guilty as charged: "Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable

---

5. We recognize the necessity of sufficient merchandise within the warehouse at the time of the fire such that the debris would substantiate the insured's claim. The legitimate or tainted title to those goods is not, however, relevant.

doubt." 106 S.Ct. at 942 (footnote omitted). The Court reasoned that a reversal would entail substantial social costs which were simply unacceptable given the curative effect of the petit jury's verdict:

> These societal costs of reversal and retrial are an acceptable and often necessary consequence when an error in the first proceeding has deprived a defendant of a fair detemination of the issue of guilt or innocence. But the balance of interest tips decidedly the other way when an error has had no effect on the outcome of the trial.

106 S.Ct. at 943.

In *United States v. Larouche Campaign,* 829 F.2d 250 (1st Cir.1987), this court had occasion to consider the parameters of *Mechanik.* The defendants in *Larouche* had been charged, *inter alia,* with credit card fraud. Defendants filed an interlocutory appeal to challenge alleged improprieties in prosecutorial conduct before the grand jury, claiming that such conduct undermined the impartiality of the jury in violation of the fifth amendment. Although the actual holding of the case rested on jurisdictional grounds, we did consider the presumptive bar of *Mechanik.* We found that the assertion of a violation of fundamental fairness might distinguish the defendants' claim from that considered and dismissed by *Mechanik:*

> [I]t is not a foregone conclusion beyond debate that if the abuse defendants claim were established, *Mechanik* would preclude relief after a judgment of conviction. The grand jury abuses alleged in the present case ... are different from the somewhat technical violation at issue in *Mechanik.* Consequently, the balancing of the societal costs of retrial against the societal interest in deterring the type of abuses alleged here may be different, and, conceivably, *Mechanik* may not forclose relief after a judgment of conviction.

829 F.2d at 253. *Accord United States v. Bucci,* 839 F.2d 825, 832 (1st Cir. 1988). At this time, however, we need not consider the outcome of a *Mechanik* balancing test in the face of a claim of fundamental fairness, because we find no error in the grand jury proceedings.

The standard for the dismissal of an indictment due to prosecutorial misconduct places a heavy burden upon appellants: "The basic rule is that, because of the constitutionally mandated independence of the grand jury and the prosecutor, courts should be reluctant to dismiss an indictment. A dismissal, therefore, will be ordered only for serious and blatant prosecutorial misconduct that distorts the integrity of the judicial process." *United States v. Ogden,* 703 F.2d 629, 636 (1st Cir.1983) (citations omitted). *Accord United States v. Rodriguez,* 738 F.2d 13, 16 (1st Cir.1984) (dismissal of indictment due to prosecutorial misconduct is extraordinary remedy.) Under this standard, we have declined to dismiss an indictment even in the face of reprehensible conduct by a prosecutor where the appellants failed to allege that the evidence presented to the grand jury was insufficient to support the indictment. *See United States v. DiGregorio,* 605 F.2d 1184, 1189 (1st Cir.), *cert. denied* 444 U.S. 437, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979). The remedy of dismissal is invoked infrequently, largely as a prophylactic tool to discourage further misconduct of a like nature. *See United States v. Houghton,* 554 F.2d 1219, 1224 (1st Cir.) (citations omitted), *cert. denied,* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977).

Gonzalez and Ocasio allege that in the present case, while no one act of the prosecution irreversibly tainted the indictment, the cumulative effect of various errors biased the grand jury in violation of the fifth amendment and requires a dismissal of the indictment and a reversal of the subsequent convictions. In support of their claim of cumulative error, appellants cite *United States v. Samango,* 607 F.2d 877 (9th Cir.1979). The *Samango* court considered a pretrial challenge to an indictment on the grounds of prosecutorial misconduct. The court based its decision to affirm the dismissal granted by the district court not on the grounds of the fifth amendment, but on the basis of its supervisory power over the grand jury. After

reviewing a number of instances of prosecutorial misconduct, including, *inter alia*, failing to warn the jurors of a credibility problem of a key witness, introducing a transcript which served no purpose other than calculated prejudice, introducing another transcript replete with leading questions which created confusion, and eliciting testimony from a government agent consisting largely of hearsay and personal conclusions as to the guilt of several of the defendants, the court found that the circumstances under which the grand jury returned the indictment threatened the integrity of the judicial process: "The cumulative effect of the above errors and indiscretions, none of which alone might have been enough to tip the scales, operated to the defendants' prejudice by producing a biased grand jury." 607 F.2d at 884.

Appellants' reliance on *Samango* is misplaced. First, as noted above, *Samango* involved a review of the dismissal of an indictment. In contrast, we are presented with a post-conviction challenge to the denial of a motion to dismiss. The Ninth Circuit has recognized the importance of this procedural distinction; in *United States v. Al Mudarris*, 695 F.2d 1182, 1188 (9th Cir.), *cert. denied*, 461 U.S. 932, 103 S.Ct. 2097, 77 L.Ed.2d 305 (1983), it denied a post-conviction challenge to an indictment where the prosecutorial behavior resembled that described in *Samango*. 695 F.2d at 1188. Second, in *United States v. DiGregorio*, 605 F.2d 1184, a case decided prior to *Samango*, we rejected a claim that the cumulative effect of alleged errors necessitated dismissal of an indictment. In *DiGregorio*, we held that while the tactics used by the prosecution to elicit testimony were objectionable and involved a disregard of ethical bounds, the impact of the errors—viewed either individually or after considering the "synergistic effect"—was harmless. *Id.* at 1189. Finally, as noted by the Ninth Circuit in cases subsequent to *Samango*, the compilation of errors in *Samango* established an extraordinary level of misconduct which is not achieved simply by raising the

specter of cumulative effect. *See, e.g., United States v. De Rosa*, 783 F.2d 1401, 1406 (9th Cir.) ("even if the prosecutor's actions constituted misconduct, an appellant must demonstrate a reasonable inference of bias on the part of the grand jury resulting from those actions.") (citations omitted), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986).

■ After examining the record in this case,[6] we find that any prosecutorial misconduct which may have occurred did not rise to constitutional proportions. We discuss each of the four alleged instances of misconduct *seriatim* in the order raised by appellants.

■ Appellants first allege that the prosecution vouched for the credibility of a key witness, Wilfredo Rivera Diaz. The record simply does not support that claim. In introducing the witness to the jurors, the prosecution noted that Rivera Diaz had testified previously before the same grand jury. The government then alerted the jurors that a discrepancy existed between prior testimony rendered by Rivera Diaz and his expected testimony on that day. Rather than vouching for the credibility of the witness, the prosecution reminded the jurors of their independent duty to assess credibility:

Now, Mr. Diaz testified on January 19....

He has since changed—not his testimony yet because he is coming in. He has changed his statement. He says there were reasons for that.

I am telling you this because we have a duty, as prosecutors in this case to disclose completely the weaknesses and the strength of the witnesses we bring before you.

We have reminded Mr. Diaz that he was under oath when he told you that and now he is going to have to explain to you again under oath why he said that.

The testimony will be his. I am not going to tell you why. He will tell you

---

6. Appellants in this case failed to provide an index to their appendixes in violation of Fed.R. App.P. 30(d). In the future, such omissions may result in the disregard of appendix materials.

why. *You have to weigh credibility. That is part of the job of a Grand Jury in determining probable cause. You have got to look at it that way.* So, please listen to him and again the decision to indict or not indict is yours. Okay? That is the law. That is what your responsibility is.

(Emphasis added). Appellants' allegation of improper vouching lacks any basis in fact and presents no grounds for reversal.

▮ Gonzalez and Ocasio next object to the discussion of events unrelated to the charges set forth in the indictment. Specifically, appellants point to the prosecutor's reference to suspicious fires on the Eleven International and R & S Sales premises during his introduction of Rivera Diaz. Although perhaps undesirable, those comments do not rise to the level of reversible error. The prosecution mentioned the Eleven International case solely because both the store and its owner played a role in the Caribbean International fire, and the grand jury may have had questions concerning that role to direct to Rivera Diaz. The R & S Sales fire was mentioned without any reason other than the involvement of a relative of Rivera Diaz. While admittedly prejudicial and unrelated to the grand jury investigation, the mere mention of an unrelated criminal act does not constitute the kind of misconduct which has necessitated dismissal of an indictment. Furthermore, the prosecutor specifically instructed the grand jury that its role was limited to a consideration of the Caribbean International case.[7] As in *United States v. Rodriguez*, 738 F.2d at 17, we find that the discussion of unrelated criminal acts coupled with an instruction to disregard such statements provides no grounds for dismissal. *Accord United States v. De Rosa*, 783

F.2d at 1405 ("in assessing the impact of [irrelevant] testimony on the grand jury, we consider the prosecutor's admonitions to the grand jury that tended to neutralize the effect of the ... testimony.").

▮ Appellants also challenge the use of leading questions by the prosecutor. They argue that throughout the testimony of Rivera Diaz, the prosecutor actually supplied most of the information. Gonzalez and Ocasio claim that the manner and form of the examination prejudiced the grand jury by effectively allowing the prosecutor to testify himself. We have reviewed the transcript of the testimony of Rivera Diaz and we find appellants' claim without merit. During the course of the examination, the prosecution would occasionally summarize the anticipated content of the testimony of Rivera Diaz. Each time, however, the prosecution then would ask the witness to explain—which explanation was invariably more complete and more damaging to appellants than the prosecutorial summation. In *United States v. Ogden*, 703 F.2d 629, we considered and rejected a charge of abuse of the grand jury proceedings based on the prosecutor's summation of prior testimony and his alleged statements concerning his opinion of the guilt of the defendant. We stated: "This is not the situation of the grand jury being lulled by a steady flow of information into accepting testimony as true without realizing that it was the prosecutor who was supplying the testimony." *Id.* at 637 (citing *United States v. Samango*, 607 F.2d at 881). This case does not present that situation either; we find no abuse.

▮ Appellants' final allegation of irregularity in the grand jury proceedings concerns the government's alleged use of the indictment to punish a noncooperating wit-

**7.** The discussion of the other fires, and the instruction to disregard, are set forth below:

You remember that this Mr. Diaz has also provided information on I think two other fires, one occurring December '79, the 11 International case. 11 International was a store, one of those wholesale consumer product stores owned by Juan Hernandez.

I mention that because 11 International and Juan Hernandez figure in this case. Okay? Another fire was the R & S Sales fire which I

believe occurred sometime in October of 1982 and that involves Mr. Diaz' I think brother-in-law—it was his son-in-law, brother-in-law. At any rate, it seems *we are not going to be able to cover those latter two cases* during your tenure inasmuch as you are going to expire the day after tomorrow. At any rate, I would like you to consider the Caribbean International case today.

(Emphasis added).

ness, Ramon Santos Baez, a reputed member of the Latorre gang allegedly involved in the preparation of false invoices. Appellants refer to the following statement by the prosecutor:

> You will hear from Agent Miller who talked to Ramon and asked him about [the fraudulent invoices] asked him to give his side, asked him to cooperate. He refused. Therefore, we are asking that he be included in the indictment because it is a false suit. He knows it is false and he would not cooperate with us in the matter so we are asking you to consider him as a possible target.

The government argues that appellants lack standing to raise this issue; appellants counter that the standing requirement poses no bar since they reference the disputed statement solely to indicate yet another instance of prosecutorial misconduct—the cumulative effect of which created a tainted indictment. We need not reach the question of standing because we find no error in the above statement. As indicated by the government, the prosecutor requested the grand jury to indict Santos Baez on the basis of his participation in the conspiracy to defraud. Only after explaining the role of Santos Baez did the prosecutor comment on his failure to cooperate. While the specific phrasing of the government's request may have been unwise, it did not create error.

In sum, we find no grounds for reversal on the basis of prosecutorial misconduct. Appellants simply have failed to demonstrate the level of abuse necessary for a fifth amendment challenge to the fundamental fairness of the proceeding.

## IV. DISQUALIFICATION OF TRIAL JUDGE

Giorgi next claims error in the refusal of Judge Perez–Gimenez to disqualify himself under 28 U.S.C. §§ 144, 455 for lack of impartiality and/or personal bias or prejudice. The defense argues that the adoption of extraordinary security measures in the courtroom during the trial, and the explanation voiced by the judge of the necessity for such action, reflect a judicial predisposi-

tion against Giorgi. Judge–Perez Gimenez denied this contention in his response to Giorgi's motion to dismiss; the judge stated that his opinion of Giorgi rested solely on facts learned during prior judicial proceedings and as such provided no cause for disqualification. Although we recognize that judicial exposure to a party in a previous case may in some extreme instances necessitate disqualification, we find no such cause in the present case.

Giorgi's challenge to the impartiality of the trial judge arises out of events which transpired on February 5, 1985, the second day of the trial. After the noon recess, counsel returned to the courtroom and found that extra security measures, in addition to the usual metal detectors and x-ray machines, had been instituted. Guards stopped, frisked and searched all those entering the courtroom, including attorneys. Giorgi contested that action, arguing that the very existence of extraordinary security measures would influence the jury's view of the parties. The judge defended his decision on two grounds. First, he noted Giorgi's prior misconduct during the trial:

> Apparently Mr. Giorgi doesn't realize that there are Marshalls here that understand Spanish, there was a visitor in the Court room who pled guilty before Judge Gierbolini last week who is your client Hector Davila Correa, and in one of the instances during the trial Mr. Giorgi turned around and told Mr. Hector Davila "matenlo ahora," which in English means "kill him now," that prompted The Court to issue an order to the Marshalls to search everybody that comes into the Court room because I am not going to eliminate people from coming into the Court room.

Second, he cited his prior association with Giorgi which took place during the change of plea hearing following Giorgi's indictment for the theft or hijacking of vans in interstate commerce. The judge explained that knowledge acquired in that context influenced his decision to adopt protective measures:

> Well, you are not searched downstairs you go through a metal detectgor [sic]

which sometimes works, no, the reason why I ordered the attorneys also, because I know there are attorneys that have and are authorized to carry weapons, sometimes that metal detector downstairs does not work well, and I was fearful that in the best interests, and without any malicious intent you could come in here with a briefcase that you may have your gun there, and to tell you the truth, I don't trust Mr. Giorgi because I sentenced him and I know what kind of an individual he is, so that's why I also included the attorneys....

He pled guilty in a previous case before me and I sentenced him, so I know his background.

Giorgi immediately noted that those remarks would force him to request a mistrial.

Giorgi filed a motion for mistrial on February 11, 1985. He attached to that motion a supporting affidavit in which he stated that the disputed incident indicated that Judge Perez–Gimenez "might be in some way and by reasons unknown to me, somewhat prejudiced against me, or pre-disposed against me in some way," and a copy of a local newspaper article describing the incident with the following headline: "En Pleno Tribunal Acusado Manda A Matar Testigo En Juicio Furgones" ("In Open Court Accused Orders Murder of Witness in Van Trial"). In the resultant opinion, Judge Perez–Gimenez treated the motion for mistrial as one for disqualification. He held that because his opinion of Giorgi arose out of a prior association in a judicial proceeding, the facts did not support a reasonable inference of bias. Further, he noted that any potential effect upon the jury due to the publicity of the event had been redressed during individual in-chambers interviews with the jurors.[8]

■ The decision to grant or to deny a motion for disqualification is committed largely to the discretion of the trial court, and we review it solely to evaluate whether the decision below amounted to an abuse of discretion. *See United States v. Parilla Bonilla*, 626 F.2d 177, 179 (1st Cir.1980) (citation omitted); *United States v. Bourque*, 541 F.2d 290, 296 (1st Cir.1976) (citations omitted). Leaving broad discretion at the trial court level protects the twin policies implicated by a motion for disqualification: not only that courts both are, and appear to be, free from bias or prejudice, but also that disqualification for bias rest upon a factual basis so as to avoid giving parties a random veto over the assignment of judges. *See In re United States*, 666 F.2d 690, 694–95 (1st Cir.1981).

Two statutes govern a motion for disqualification: 28 U.S.C. §§ 144, 455. Section 144 provides, in pertinent part:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

And section 455 provides, in pertinent part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding....

Giorgi assigns error in the application of both provisions.

■ Giorgi first argues that Judge Perez–Gimenez erred in ruling upon the contested motion himself. Giorgi cites section 144 for the proposition that another judge must be assigned to rule on a motion for disqualification. We rejected that approach in *United States v. Kelley*, 712 F.2d 884 (1st Cir.1983):

When an affidavit of personal bias or prejudice is filed pursuant to section 144,

---

**8.** Although appellant has not raised the claim of juror bias on appeal, we note that the court below followed the proper course of conduct in response to the allegation of jury taint or bias. *See United States v. Corbin,* 590 F.2d 398, 400–01 (1st Cir.1979).

a trial judge is not required immediately to recuse himself.... Although the trial judge may not pass upon the truth of the matters asserted ... the trial judge *must* pass upon the legal sufficiency of the affidavit.

*Id.* at 889 (citations omitted) (emphasis added). Judge Perez–Gimenez correctly followed this mandate; he reviewed the motion and supporting materials and found no legal basis for disqualification therein.

▮ We move, therefore, to Giorgi's second allegation of error: that the ruling of the court below runs afoul of section 455. That provision sets forth two grounds for disqualification. We first examine, and dismiss, the question of personal bias or prejudice addressed in section 455(b)(1). We have held that disqualification for personal bias or prejudice necessitates a showing that the alleged bias or prejudice be both personal and extrajudicial: "Facts learned by a judge while acting in his judicial capacity cannot serve as a basis for disqualification on account of personal bias." *Kelley,* 712 F.2d at 889 (citations omitted); *accord Parilla Bonilla,* 626 F.2d at 180 (same). Because the opinion of Giorgi voiced by Judge Perez–Gimenez rests solely on facts learned in judicial proceedings, we find that no cause for disqualification exists under section 455(b)(1).

We turn next to section 455(a). The amendment of that provision in 1975 changed the standard for recusal from a subjective to an objective one: "The proper test ... is whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. § 455, but rather in the mind of the reasonable man." *United States v. Cowden,* 545 F.2d 257, 265 (1st Cir.1976) (citations omitted), *cert. denied,* 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977). Although the knowledge of a defendant gained during a judicial proceeding

*may* present grounds for a reasonable person to question a judge's impartiality, *see Blizard v. Frechette,* 601 F.2d 1217, 1220 (1st Cir.1979) (citation omitted), mere exposure to prejudicial information does not, in itself, establish the requisite factual basis: "[T]he judicial system could not function if judges could deal but once in their lifetime with a given defendant, or had to withdraw from a case whenever they had presided in a related or companion case or in a separate trial in the same case." *Cowden,* 545 F.2d at 266 (citations omitted). And we have held that unless a party can establish a reasonable factual basis to doubt a judge's impartiality "by some kind of probative evidence," then a judge *must* hear a case as assigned. *Blizard,* 601 F.2d at 1221 (citation omitted). Thus in *Blizard* we affirmed the decision of a trial judge to deny a motion for disqualification, even where the transcript revealed several disparaging characterizations from the bench of appellant and her case, because the record supported those negative conclusions. Similarly, we have held that the mere fact of an adverse ruling, *see, e.g., Kelley,* 712 F.2d at 890, or a negative determination as to credibility, *see, e.g., United States v. Mirkin,* 649 F.2d 78, 82 (1st Cir.1981), does not—standing alone—create an inference of lack of partiality.

In *United States v. Cepeda Penes,* 577 F.2d 754 (1st Cir.1978), we addressed the question of impartiality in the context of a factual situation strikingly similar to the one at bar.[9] Appellant contested the refusal of the trial judge to recuse himself after he presided at a plea hearing in which appellant withdrew a plea of *nolo contendere.* Appellant based his claim of lack of impartiality on two facts: (1) the judge indicated in court that he considered a plea of nolo to be substantially equivalent to a plea of guilty and therefore, appellant alleged, the judge would view the plea as a prior admission of guilt, and (2) subsequent to the plea hearing, a leading newspaper in

---

9. We note, with some concern, that none of the parties to this action cited either to *Cepeda Penes* or, with one exception, to the relevant first circuit cases on the question of disqualifica-

tion. Rather reliance was placed (and in the case of appellant misplaced) on rulings from other circuits.

Puerto Rico published an article stating that appellant had first admitted and then denied his guilt. *Id.* at 757. We characterized those allegations as "mere surmise and conjecture" and stated: "Trial judges are well aware that a multiplicity of factors enter into any decision to plead to an indictment. Thus, the mere fact that a judge has participated in plea discussions, without more, does not provide a reasonable basis for questioning a judge's impartiality." *Id.* at 758 (citation omitted).

 We find *Cepeda Penes* controlling. Giorgi has merely alleged that Judge Perez–Gimenez formed a negative opinion of Giorgi's character at a prior plea hearing, as reflected by his actions and statements in court, and that the assessment eroded his impartiality. We disagree. The record supports the decision to increase security in the courtroom but stops short of supplying a factual basis for an inference of lack of impartiality. Although the appearance as well as the reality of fair and impartial justice has a demonstrable value, Giorgi simply has failed to set forth facts which would create any doubt in the mind of a reasonable person.

## V. CROSS–EXAMINATION OF DEFENSE WITNESS

Ocasio challenges the alleged improper conduct of the prosecutor during the cross-examination of a defense witness and argues that the trial court improperly denied a motion for mistrial. We find that the prosecutor acted reasonably, but that even if his cross-examination did exceed acceptable bounds, any error which resulted was harmless.

The alleged misconduct arose during the cross-examination of Lorenzo Delgado Figueroa, an arson investigator and co-worker of Ocasio. During cross-examination, the government attempted to impeach the credibility of the witness by asking questions concerning his role in the preparation of a police arson report on a 1979 fire which took place at the Eleven International Cash & Carry, a business owned by Juan Hernandez Roman. Ocasio objects to two specific questions. First, he complains of the following query: "Now, let me ask you, is it not true that Mr. Juan Hernandez Roman paid you off to get this report written?" He next objects to the subsequent query: "Isn't it true that after this report was written that you took a trip to Santo Domingo with Mr. Juan Hernandez, a pleasure trip?" The witness denied both charges. Following that interchange, the defense requested a side bar conference. During the conference, the prosecution claimed that it had a factual basis for initiating the disputed line of questioning and that it could produce witnesses to substantiate its charges. No cautionary instruction was given to the jury.

Ocasio moved for a mistrial. In his motion, Ocasio argued that the prosecutor had asked the challenged questions solely "to prejudice and to poison the jury's mind." The court disagreed. It found that the government had asked the questions in good faith, and that the defense had failed to demonstrate any resulting prejudice. The court therefore denied the motion for mistrial.

 We review the denial of Ocasio's motion under an abuse of discretion standard. *See United States v. Chamorro,* 687 F.2d 1, 6 (1st Cir.) (citations omitted), *cert. denied,* 459 U.S. 1043, 103 S.Ct. 462, 74 L.Ed.2d 613 (1982). His argument reduces to a claim that the government violated the standard for prosecutorial conduct set forth in *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). *Berger* involved, *inter alia,* a challenge to a conspiracy conviction on the basis of prosecutorial misconduct during the cross-examination of a witness. The Court found that, in fact, the prosecutor had "overstepped the bounds of that propriety and fairness which should characterize the conduct of ... an officer in the prosecution of a criminal offense...." *Id.* at 84, 55 S.Ct. at 631. In its opinion, the Court set a high standard for prosecutorial behavior:

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at

all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods *calculated to produce a wrongful conviction* as it is to use every legitimate means to bring about a just one.

*Id.* at 88, 55 S.Ct. at 633 (emphasis added). We find that the prosecutor in the instant case did not run afoul of this admonition. *Berger* places an emphasis on improper methods knowingly employed by the government; no such bad faith motivated the prosecutor in this action. The disputed cross-examination represented an effort to impeach the credibility of Delgado. The good faith of the government, and the reasonableness of its inquiry, are demonstrated by the subsequent indictment and conviction of that witness. *See United States v. Delgado Figueroa,* 832 F.2d 691 (1st Cir.1987).

Even were we to find the prosecutor's methods improper, that alone would not suffice to reverse the conviction. Under *Berger,* a party must show both misconduct and resulting prejudice. *See* 295 U.S. at 89, 55 S.Ct. at 633. The prosecutor in *Berger* engaged in an objectionable course of conduct which the court found to have a "probable cumulative effect upon the jury which cannot be disregarded as inconsequential." *Id.*[10] We have interpreted *Berger* to necessitate a new trial only where the misconduct was likely to have

affected the outcome of the trial or where a sanction is necessary to discourage future misconduct. *See United States v. Capone,* 683 F.2d 582, 585–86 (1st Cir.1982). In *Capone,* we established a four-prong inquiry to evaluate claims of prosecutorial misconduct: "[W]e must examine the context of the improper remarks more closely, looking at the severity of the misconduct, whether it was deliberate or accidental, the likely effect of the curative instruction, and the strength of the evidence against the appellants." *Id.* at 586 (citations omitted). Applying this test to the facts before us, we see no cause for a new trial. The misconduct, if any, was slight, the questions were posed in good faith, and the key prosecution witness linked Ocasio closely to the conspiracy. The absence of a cautionary instruction does not sway our determination that the challenged conduct had no effect on the verdict of the jury and does not necessitate a new trial.

## VI. LIMITATION OF CROSS–EXAMINATION

Gonzalez and Ocasio next contest the decision of the trial court to grant the government's motion in limine to prohibit all cross-examination of Wilfredo Rivera Diaz concerning the psychiatric history of that important government witness. Appellants argue that the testimony of Rivera Diaz was essential to the prosecution's case, providing a necessary link between appellants and the criminal activities charged in the indictment, and that all elements of the competence and credibility of the witness should have been open to examination.

Appellants base their allegations of mental impairment on the following facts. In 1972, Rivera Diaz received a discharge from military service with a ten percent

**10.** The Court summarized the objectionable behaviour as follows:
He was guilty of misstating the facts in his cross-examination of witnesses; of putting into the mouths of such witnesses things which they had not said; of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered; of pretending to understand that a witness had said something which he had not said and persistently cross-examining the witness upon that basis; of assuming prejudicial facts not in evidence; of bullying and arguing with witnesses; and in general, of conducting himself in a thoroughly indecorous and improper manner.
295 U.S. at 84, 55 S.Ct. at 631.

disability due to his mental condition. Two years later, a military examination determined that condition to have improved and stabilized. In 1983, a court-ordered examination found no evidence of mental disability; the report of that exam did not indicate, however, if the examiner had explored the past medical history of the patient.

After hearing the above facts, the trial court found Rivera Diaz competent to testify and ruled that the alleged mental impairment of the witness did not constitute a proper ground for cross-examination. The court noted that ample opportunities existed to undercut the credibility of the witness, including inconsistencies in statements made to both the F.B.I. and the grand jury, which provided better grounds for impeachment than an inquiry into prior mental treatment.

■ We affirm the holding of the district court. Our decision is controlled by the recent ruling in *United States v. Gonzalez–Sanchez*, 825 F.2d 572, in which we considered a similar challenge to the limitation of cross-examination into the mental history of a key witness. In fact, *Gonzalez–Sanchez* involved the same government witness, Wilfredo Rivera Diaz, and one of the same appellants, Pedro Gonzalez Sanchez, in a case arising out of a conspiracy to burn a warehouse owned by Rivera Diaz and to defraud its insurer, PRAICO. On the basis of that decision, we find no abuse in the exercise of the trial court's discretion.

## VII. EVIDENCE OF PRIOR CRIMES

Gonzalez claims error in the admission of evidence of prior crimes in violation of Rule 404(b) of the Federal Rules of Evidence. He argues that the testimony in question concerned criminal activities bearing little or no relation to those charged in the indictment, and that the government solicited the testimony solely to prejudice him by predisposing the jury against him. We have reviewed the transcript and find no reversible error in the admission of the evidence.

The contested evidence falls into two broad categories. Gonzalez first points to testimony by two witnesses, and a remark by the prosecutor in his opening statement (a remark later confirmed by a witness) which described the involvement of the Latorre gang in the theft of vans and which identified Gonzalez as both a member of that gang and a close personal friend of Jose Luis Latorre—the boss of the gang. Gonzalez also points to testimony concerning his prior involvement in an insurance fraud in concert with Jose Luis Latorre.

The admission of the contested evidence is governed by Rule 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We recently considered the application of that rule to Gonzalez in *United States v. Gonzalez–Sanchez*, 825 F.2d 572, and we find our analysis there decisive in the instant case. In *Gonzalez–Sanchez*, Gonzalez complained of the admission of evidence concerning his counselling of gang members in connection with the theft of vans, and his role in arson for profit and insurance frauds other than that charged in the indictment (the other frauds included the Caribbean International scheme herein at issue). We found no reversible error in either instance. As to evidence concerning the involvement of the Latorre gang in the theft of vans and the relationship of Gonzalez with the gang, we stated, *inter alia,* that the evidence bore upon the knowledge and intent of Gonzalez: "That he handled the legal matters in past criminal activities of the gang and that he had knowledge of its criminal activities is probative of the intent of his conduct in connection with the ... fire." *Id.* at 583. We also found the evidence concerning past arsons and insurance fraud probative of criminal intent: "Evidence, therefore, that Gonzalez helped gang members collect on other fire insurance policies and evidence that he counselled gang members to commit arson was necessary to dispel the inference of inno-

cent conduct and to prove that his participation was with full knowledge of the aims of the conspiracy." *Id.* at 582. We find *Gonzalez–Sanchez* indistinguishable from the present case and therefore reject the evidentiary challenge of Gonzalez once again.

## VIII. SUFFICIENCY OF THE EVIDENCE

Gonzalez contends that insufficient evidence exists to support a finding of guilt beyond a reasonable doubt on count eleven of the indictment. The disputed count charged Gonzalez with placing in the mail a letter addressed to Colgate Palmolive, a regular supplier of merchandise to Caribbean International, requesting a statement of the latter's outstanding debt to Colgate Palmolive in furtherance of the scheme to defraud.[11]

 In reviewing Gonzalez's claim, we regard the evidence—including all reasonable inferences which may be drawn therefrom—in the light most favorable to the government. We must determine whether a reasonable person, so viewing the evidence, could find guilt beyond a reasonable doubt. That determination does not require the exclusion of every possible hypothesis of innocence, it merely requires support for a reasonable interpretation which would lead to a guilty verdict. *See United States v. Beltran,* 761 F.2d 1, 5–6 (1st Cir.1985); *United States v. Quejada–Zurique,* 708 F.2d 857, 859 (1st Cir.), *cert. denied,* 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983); *United States v. Hensel,* 699 F.2d 18, 33 (1st Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); *United States v. Patterson,* 644 F.2d 890, 893 (1st Cir.1981).

 The evidence admitted by the court concerning the charge in question is threefold. First, Gonzalez signed a stipulation with the government in which he admitted to placing a letter in the mail requesting a statement of Caribbean International's debt to Colgate Palmolive on or about October 28, 1980.[12] Given that admission, a finding of guilt under count eleven of the indictment would require only that the jury infer that the action in question was taken in furtherance of the scheme to defraud. Such an inference could reasonably be drawn from (1) testimony by Benjamin Acosta, the insurance agent managing Caribbean International's claim with PRAICO, that he and Gonzalez exchanged several communications regarding said claim, and (2) testimony from Wilfredo Rivera Diaz that he had commissioned Gonzalez to reconstruct the inventory of Caribbean International and to obtain invoices and statements of debts from suppliers of the company. We find this evidence sufficient to sustain the conviction.

## IX. CONCLUSION

We have examined all the arguments raised by appellants, including those not discussed in this opinion, and we find no grounds for reversal. The convictions of appellants Edgardo Giorgi, Gilberto Ocasio Gonzalez and Pedro Gonzalez Sanchez are therefore affirmed.

---

11. The relevant portion of count eleven charges that Gonzalez,
 did place and cause to be placed in an authorized depository for mail matter, an envelope, containing a letter requesting a statement of Caribbean International's debt to Colgate Palmolive, addressed to Colgate Palmolive ... to be sent and delivered according to the direction thereon by the United States Postal Service. All in violation of Title 18, United States Code, Sections 1341 and 2.

12. The stipulation provided, in relevant part:
 That on or about October 28, 1980, Attorney Pedro Gonzalez–Sanchez placed or caused to be placed in an authorized depository mail matter an envelope containing a letter ... requesting a statement of Caribbean International's debt to Colgate Palmolive addressed to Colgate Palmolive ... to be sent and delivered according to the direction thereon by the United States Postal Service.