No. 71,567

STATE OF KANSAS, *Appellee,* v. DONICE M. JOHNSON, *Appellant.*
(899 P.2d 484)

Opinion filed July 14, 1995.

*Thomas Jacquinot,* special appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Joan M. Hamilton,* district attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: Pursuant to a plea agreement, Donice M. Johnson was convicted of first-degree murder (K.S.A. 1992 Supp. 21-3401) and aggravated kidnapping (K.S.A. 21-3421), for which she received two consecutive life sentences. Johnson appeals, contending that the State violated a term of the plea agreement. She seeks resentencing by a different district judge or, alternatively, withdrawal of her guilty pleas.

On April 25, 1993, defendant, two of her brothers, and her boyfriend murdered 16-year-old Amanda Gardner in order to obtain the victim's automobile. The murder was premeditated and particularly brutal. One of the brothers, Joe Johnson, III, pled guilty to first-degree murder, aggravated kidnapping, and theft. Defendant pled guilty, as previously stated, to first-degree murder and aggravated kidnapping. In exchange for her plea the State agreed: (1) to dismiss a theft charge; (2) not to ask the court for the "hard forty" or to proceed to trial on the "hard forty"; and (3) to take no position as to whether concurrent or consecutive sentences should be imposed.

Sentencing of defendant and her brother Joe were set at the same day and time, with Joe's case being first called. In that case, the State gave a detailed account of the crimes, including the chok-

ing of Amanda with a purse strap and her subsequent regaining of consciousness which was followed by a beating. The victim again regained consciousness, and was then strangled to death. The victim's sister, Renee Gardner, spoke eloquently and powerfully on behalf of the victim's family, urging the court to impose consecutive sentences in both cases. In defendant's case, the following transpired:

"MRS. HAMILTON [State's attorney]: Your Honor, just as argument was made in the defendant Joe Johnson's case, the factual basis as to criteria and so forth would be the same argument the State would have, so I'm not going to go through all of that. But, in relating it directly to Donice Johnson, I think there are some important things here to relate particularly as a result of defense counsel for Joe Johnson has made comments that Mr. Johnson wants to make sure that you consider his heavy involvement in this in order to then give his sister a reduced sentence, I think the important thing is to note that I didn't, as the State, say that I would concur or go along with concurrent sentences. That has never been the position, and if it is that we would go along with concurrent sentences, that would have been the deal entered, it wouldn't have caused this much ruckus. If I were up here asking for concurrent, I am sure there would have been no objection made. The position was that the State would take no position, but present to the Court everything that the Court should have in front of [it] to make a decision, and then decide whether or not this defendant, Donice Johnson, was worthy of concurrent or consecutive. And that's what the State still intends to do.

"You have heard the comments from the victim's family. I think it's pretty obvious, aside from the extent of harm caused by even this defendant's conduct. What is important to remember was Donice Johnson's participation in this. Kansas law is very strong to say if the person who shoots, if the person who did the actual killing did it, but with the assistance or knowledge and planning of someone else, that the aider and abettor is just as guilty as the principal person. And in this case, as strongly put by the victim's family, it was Donice Johnson who had actually set up the victim. It was actually Joe Johnson who had decided, yeah, we need a car, let's just pick a victim with a car, maybe we could just get a car. And then it was decided that Mandy was an easy target. And it was Donice Johnson's knowledge of Mandy that knew that Mandy would go with her even on whatever the pretense was.

"What's also important is with this stipulation of facts that was considered in the State's case as to Donice Johnson's own confession to New Jersey, that when she returned after she thought—and it was planned that Mandy would be dead when she returned—that though when she came back, she was shocked. The shock was because she said you did it that quick, not that you did it at all. She knew that the murder was planned and that she thought at that point Mandy was dead and that they had done it so quickly, so coldly and so calculated. But the

fact is, too, that as I told you with the facts, this defendant had an opportunity somehow to say this has gotten out of line, this is out of it. If Joe Johnson who made the statement whether he was smoking marijuana and was out of it was there, Donice came back and there was no confession on her part that she was in the state of mind that she was influenced by drugs or alcohol. And she admitted that Amanda came to, that there could have been an opportunity at that point to even dump her still alive because they had the car, they had what they wanted. And Donice not only didn't do anything about it to help Mandy, but she was there when the actual murder did go—did go down, it did take place. She remained, whatever her condition was, as far as what Joe and her boyfriend and Jerry had done, she remained with them, and in fact when they put the car in the parking lot and talked to the little brother, played basketball and disposed of the body. And she went with them when they went to New Jersey. It was Donice, because she was the woman involved, who pawned the victim's cellular phone and jewelry. I mean, the involvement was very entwined.

"Looking at that criteria, and using your discretion, we're asking that the Court weigh it very carefully, but—

"MR. KESSLER [Defense counsel]: (Interrupting) Your Honor, I will have to object. I think this goes beyond the statement of fact; and by advocating a certain position to be taken on criteria listed in K.S.A. 21-4606, the district attorney is not complying with her agreement in this case.

"THE COURT: Do you wish to respond?

"MRS. HAMILTON: Your Honor, only that I am. I was just going to ask that you have to take those factors into consideration.

"THE COURT: Well, I think the State is getting perilously close. I don't think one can say they are going to take no position, and argue for a fairly extended period of time on factors which might well militate against a no recommendation position. I am going to have to sustain the objection. It's one thing for the State to tell concretely what the facts are. Of course, the Court has carefully considered all of this, and I really haven't heard anything very much that's new, although I think it is usually helpful to have both sides tell the Court factual circumstances which are appropriate for consideration. But, I think the State is treading on thin ice at this point, so I would sustain the objection."

"MRS. HAMILTON: Thank you, Your Honor. I will proceed only in regards to Donice Johnson's—go into the statements as to the PSI.

"Your Honor, the Court again, because this is—even if it was under the sentencing guidelines, these are two, again, she has agreed to plead to both counts, and the State took those pleas to both counts of aggravated kidnapping and murder in the first degree, those—those counts being off the grid. In regards to criminal history, the PSI has indicated, and we would agree, that this defendant had no prior history. Her birth date is 1973, Your Honor, which would make her 20 years old, and the older of all of the people involved.

"For all of those foregoing reasons, Your Honor, the State would offer those facts for your consideration and leave it to your discretion with the consideration of the family as well. Thank you."

Defense counsel then addressed the court.

In sentencing defendant to consecutive life sentences, the district court stated:

"This matter has now been submitted for decision to the Court. And, once again, the Court notes that under Kansas Statutes Annotated 21-4601, the Court must consider the individual characteristics, circumstances, needs, potentialities of the defendant and consider the dangerousness of the offender and the other factors which have been noted in that statute.

"The Court also, as noted earlier, must consider the sentencing criteria under 21-4606. The Court then referring to those factors notes that there is no prior criminal activity or history on the part of the defendant, that is none as a juvenile or as an adult. The Court also notes with respect to the extent of the harm, that this was the greatest imaginable harm that could be visited on a victim and a victim's family. The Court further notes that there must be a consideration of whether the defendant intended that the criminal conduct would cause or threaten serious harm. Under the facts that the Court has noted—and I do want to say, once again, in this case that I have carefully considered the contents of the Court Services file, the court file, all of the hearings, all of the arguments of counsel, and, of course, the presentence investigation and report. So, with that in mind, it seems clear to the Court that the defendant knew that terrible consequences were about to ensue if this plan were carried out and therefore she must have been charged with the intent of the probable and natural consequences of the actions which were planned. The next factor which the Court would note under the statute is the degree of defendant's provocation. There was absolutely no provocation at all. There was only friendship. There was no conduct whatsoever on the part of the victim which would in any way under any imagination constitute provocation. The next factor which the Court should consider is whether there are substantial grounds tending to excuse or justify defendant's conduct. And, once again, there are no grounds at all that the Court can see which would tend to excuse or justify the conduct. The next factor is whether the victim induced or facilitated the commission of the crime. And, here again, there is nothing that the victim did to induce or facilitate the commission of the crime. The final factor is compensation, but compensation is really a very minor factor now in view of the great seriousness of the crime, itself, and the consequences of the crime.

"Now, also, there are several other factors which the Court would note in passing. We have a very youthful victim, age 16, a young teenage girl. There is almost a randomness to the homicide. It seems that she was by chance selected because she had a car. It appears that the selection of the victim placed her in a helpless situation where she was—there was no way that she could have obtained any type of assistance to get out of this deadly situation that she found herself in. The defendant here was the oldest of the people involved and, therefore, presumably would have had some persuasiveness as far as the deadly enterprise in question. She was the victim's friend, and that suggests that this friendship was misused

in a very deadly way. It appears that the defendant was in on the crime from the start, she knew what was intended, and apparently was involved in extensive discussions concerning the plan and how it would be executed. It appears that she probably was the major access to the victim based upon the friendship and acquaintance she had. It appears that during the course of the crime, she did facilitate the plan, itself, and she did have a substantial participation in all stages of the plan, the planning phase, itself, the early stage, and actual carrying out of the homicide and the theft, and then leaving town, obtaining ammunition and then leaving town with the other persons involved. It seems in many respects, her participation in the homicide was essential, and one has to question whether it could have been carried out without her participation.

"For all of these reasons, I think that she's quite culpable, notwithstanding her excellent record at this point in time."

For her sole issue on appeal, defendant argues that the prosecutor's objected-to comments were violative of the plea agreement as they were, in essence, advocating consecutive sentences. The district court found the State was "perilously close" to violating the agreement and sustained the objection. The State then closed quickly.

The State points out that being held to be "periously close" to a violation is not the equivalent of being held to have committed the violation. The State also noted that in the plea agreement the State did not agree to stand mute at the sentencing, a term included in some of its plea agreements.

Defendant relies heavily on *Santobello v. New York*, 404 U.S. 257, 30 L. Ed. 2d 427, 92 S. Ct. 495 (1971), for support.

In *Santobello*, the prosecutor agreed to make no sentence recommendation. During a seven-month delay between the hearing at which the plea agreement was accepted and the sentencing, the cast changed, with the presiding judge having retired and a new prosecutor taking over the case. At the sentencing, the State recommended a maximum sentence. Defense counsel immediately objected that the plea agreement had been breached. The trial court overruled the objection and proceeded to sentence the defendant to the maximum sentence, stating that it did not rely upon the recommendation by the State. 404 U.S. at 258-60.

In *Santobello*, the United States Supreme Court recognized the necessity of judicial safeguards to protect the integrity of a plea

agreement: "[A] constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." 404 U.S. at 262. Although the trial judge stated that the prosecutor's recommendation did not influence him, the Court concluded that the interests of justice and appropriate recognition of the duties of the prosecution in relation to promises in the negotiation of pleas of guilty would thus be served by remanding the case to the state courts for further consideration. The Court then left the ultimate relief to be awarded petitioner to the discretion of the state court, allowing it to determine whether specific performance of the agreement should be imposed with resentencing before a different judge or whether the circumstances required allowing petitioner to withdraw his plea of guilty. 404 U.S. at 262-63. Following *Santobello*, the courts have placed a heavy burden upon the Government to follow meticulous standards in both promising and performing plea agreements. See, *e.g.*, *U.S. v. Giorgi*, 840 F.2d 1022, 1026 (1st Cir. 1988).

In *State v. Hill*, 247 Kan. 377, 799 P.2d 997 (1990), defendant pled guilty, as part of a plea agreement, to three class A felonies and five class B felonies. In exchange for his plea, the State promised, *inter alia*, to recommend a controlling term of two consecutive life sentences.

At the sentencing hearing in *Hill*, the prosecutor stated:

" '[T]hose [PSI] investigations were conducted in a thorough and competent, complete manner, of setting out the recommendations as entered into at the time of the plea bargain between the prosecution, the State.

" 'Further, Your Honor, I would like to state that the victim impact statement of that report made it very clear that the victims' position[s] are that no amount of time in this case is going to be enough time for the damage and for the crimes that have been committed against the State of Kansas, against the family of [D.B.], against [D.B.], and against [V.F.]. But that the Court is in a position, having reviewed this material, having heard the statements of fact which support the pleas of guilty and the convictions in this case, to at this time render a proper and appropriate sentence.' " 247 Kan. at 378-79.

Defendant did not object to the statements. The trial court sentenced defendant to three consecutive life sentences. At a hearing

on defendant's motion to modify sentence, the prosecutor made no statement.

On appeal, defendant contended that the State failed to adhere to its promise to recommend a controlling term of two consecutive life sentences at both the sentencing and at the hearing on the motion to modify sentence. At sentencing, instead of specifically stating its recommendation, the State referred to the PSI report, which contained the State's plea agreement recommendations.

We rejected this argument, reasoning:

"When defendant's guilty plea was accepted, the judge was informed of the State's recommendation of two consecutive life sentences with all other sentences running concurrently thereto. Although the State did not specifically state its recommendation on the record at the sentencing hearing, the prosecutor did refer the court to the recommendation stated in the PSI. Comments at sentencing establish that the trial court relied upon the PSI throughout and was aware of the State's recommendations. In fact, just prior to imposing sentence, the court acknowledged that it was aware of the State's recommendation but chose instead to exercise its independent judgment by imposing three life sentences. Although the additional comments by the prosecutor were questionable in light of the plea agreement, the prosecutor urged the court to review the materials in the PSI. These materials make clear that the surviving victim and families of both victims accepted the recommended controlling sentence of two life terms to be served consecutively.

"At the hearing on the motion to modify sentence, the State did not actively restate the recommendation of two consecutive life sentences but, instead, made no statement and merely asked the court to rule upon the motion. In denying the motion, the court stated its knowledge that the plea negotiations resulted in a recommendation of two consecutive life sentences. The court followed its previous decision that three consecutive life sentences should be imposed in this case and stated that no development since the prior sentencing would cause the court to alter that position.

"We conclude the State did not breach the plea agreement or violate the defendant's due process rights. Crucial to our conclusion is the fact that the court was aware of the plea bargain and the State's recommendation at the time of the plea, sentencing, and the hearing to modify sentence. Although the State should refrain from making comments inconsistent with the plea agreement, here, the additional comments by the prosecutor were not tantamount to making a recommendation contrary to the plea agreement." 247 Kan. at 386.

Unlike *Santobello*, in both *Hill* and the case before us, the same judge presided throughout the proceedings and was familiar with the terms of the plea agreement.

Defendant does not contend that the State had negotiated away its right to speak at the sentencing hearing. In speaking to the court, the State had the right to and did state the extent of defendant's participation in the crimes. A less than truthful soft pedalling or whitewashing of the extent of defendant's participation in stating the facts to the court would have been inappropriate. On the other hand, editorializing on the facts could be considered as urging consecutive over concurrent sentences, the only issue before the court at sentencing as both offenses were class A felonies.

In reviewing the prosecutor's comments themselves and also in their proper context within the sentencing proceeding, we conclude the comments were not tantamount to making a recommendation contrary to the plea agreement. Having made this determination, it is unnecessary to determine what form of relief would be appropriate if relief were to be granted.

The judgment is affirmed.